[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Castellon v. Rose*, Slip Opinion No. 2025-Ohio-1491.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-1491

THE STATE EX REL. CASTELLON *v*. ROSE ET AL.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Castellon v. Rose*, Slip Opinion No. 2025-Ohio-1491.]

*Mandamus—Public-records requests—Writ denied as moot and relator's requests for statutory damages, attorney fees, and court costs denied.*

(No. 2024-0201—Submitted January 7, 2025—Decided April 29, 2025.)

IN MANDAMUS.

_____

The per curiam opinion below was joined by FISCHER, DEWINE, BRUNNER, DETERS, HAWKINS, and SHANAHAN, JJ. KENNEDY, C.J., concurred in part and dissented in part, with an opinion.

**Per Curiam.**

**{¶ 1}** Relator, Estephen Castellon, filed an original action seeking a writ of mandamus against respondents, the Ohio Department of Rehabilitation and

Correction ("ODRC") and Kelly Rose, an ODRC employee, for allegedly failing to respond to public-records request Castellon had made. He seeks a writ ordering production of the records and also requests statutory damages, attorney fees, and court costs. Because respondents have now provided all requested records, we deny the request for the writ as moot. We also deny Castellon's requests for statutory damages, attorney fees, and court costs.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2} Castellon was previously confined at ODRC's Richland Correctional Institution. On December 18, 2023, he finished his prison sentence and was released.

{¶ 3} On November 27, prior to his release, Castellon sent an electronic kite to Rose.[1] Rose is the institutional inspector for the Richland Correctional Institution, and his duties include assisting with responding to inmates' public-records requests. Castellon wrote, "I need copies of the following communications for legal purposes." He then listed 21 different nine-digit numbers. Castellon did not otherwise explain the significance of the numbers. Rose replied the next day, telling Castellon that he would have to submit a cash slip for copies of kites, that the initial copy of a grievance or appeal was free, and that he would need to list the particular kite number he was requesting. Castellon replied later that day, saying that he could pay for the copies but that he needed the copies that week because he would be released soon. Rose replied on November 29, telling Castellon to meet with him to get the copies. He also instructed Castellon to bring a cash slip as well as the proper numbers and dates for the items he was requesting.

{¶ 4} The parties dispute what happened next. Castellon avers that he met with Rose on November 30 at Rose's office. He alleges that he brought a cash slip for the cost of the copies but that Rose told him he "wasn't going to stop what he

---

1. "A kite is a type of written correspondence between an inmate and prison staff." *State ex rel. Griffin v. Szoke*, 173 Ohio St.3d 485, 2023-Ohio-3096, 231 N.E.3d 1072, ¶ 3.

was doing just to print 80 grievances." Castellon further alleges that at that meeting, Rose told him that he could request the copies from ViaPath, the company that provides and services electronic tablets that are issued to inmates. In contrast, Rose avers that Castellon did not meet with him. Instead, Rose states, he told Castellon by kite that Castellon could also request the kites he wanted directly from ViaPath. Ultimately, Castellon did not receive any copies prior to his release.

{¶ 5} On January 17, 2024, after his release, Castellon emailed a public-records request to ODRC. He requested copies of "the following public records/grievances" and then listed 28 different numbers. Many of these are the same numbers he had listed in his November 27 kite to Rose, but he also requested additional documents. On January 30, an ODRC employee sent Castellon an email stating that the employee had contacted the legal department, which "should assist [him] further." There is no indication in the record that ODRC provided any additional response to the request before Castellon filed this mandamus action.

{¶ 6} On February 8, Castellon filed this mandamus action. He requests a writ ordering respondents to produce the public records he requested. He also requests awards of statutory damages, attorney fees, and courts costs.

{¶ 7} On February 13, we referred the case to mediation. 2024-Ohio-523. The parties agree that ODRC has since provided Castellon with the requested documents. But the parties have not resolved Castellon's requests for damages, fees, and costs. We returned the case to the regular docket, issued an alternative writ, and ordered the submission of evidence and briefs. 2024-Ohio-2060; 2024-Ohio-2937.

## II. LEGAL ANALYSIS

### A. Castellon's motion for leave to file rebuttal evidence

{¶ 8} Castellon has filed a motion for leave to file rebuttal evidence under S.Ct.Prac.R. 12.06(B) and submitted 18 proposed exhibits. Respondents did not respond to the motion. However, the exhibits Castellon seeks to file are

unauthenticated and unsworn. Evidence submitted in original actions should comport with the Rules of Evidence, and we may strike unauthenticated evidence. *See State ex rel. Mun. Constr. Equip. Operators' Labor Council v. Cleveland*, 2007-Ohio-3831, ¶ 39; *see also* S.Ct.Prac.R. 12.06(A) ("Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached."). Because the rebuttal evidence Castellon seeks to file is not authenticated, we deny his motion for leave.

### B. The request for the writ is moot

**{¶ 9}** "[U]pon request by any person, a public office or person responsible for public records shall make copies of the requested public record available to the requester at cost and within a reasonable period of time." R.C. 149.43(B)(1). A writ of mandamus is an appropriate remedy to compel compliance with the Public Records Act, R.C. 149.43. *See* R.C. 149.43(C)(1)(b). To be entitled to a writ of mandamus, Castellon must establish a clear legal right to the requested relief and a clear legal duty on the part of respondents to provide it. *State ex rel. Cincinnati Enquirer v. Sage*, 2015-Ohio-974, ¶ 10.

**{¶ 10}** Because the parties agree that ODRC has now provided Castellon with the requested records, we deny Castellon's request for a writ of mandamus as moot. *See State ex rel. Grim v. New Holland*, 2024-Ohio-4822, ¶ 5 ("Because both parties in this case agree that [the relator]'s public-records requests have been satisfied, his mandamus claim is moot.").

**{¶ 11}** Castellon's requests for statutory damages, attorney fees, and court costs, however, are not moot. *See id.*

### C. Statutory damages

**{¶ 12}** To be entitled to statutory damages, Castellon must show that he transmitted a written request by hand delivery, electronic submission, or certified mail and that the public office or person responsible for the records failed to comply

4

with obligations under R.C. 149.43(B). R.C. 149.43(C)(2).[2] Castellon submitted his November 2023 public-records request through the prison's electronic kite system—which constitutes electronic submission for the purposes of R.C. 149.43(C)(2), *see State ex rel. Griffin v. Szoke*, 2023-Ohio-3096, ¶ 8—and sent his January request by email. Castellon argues that he is entitled to statutory damages because respondents did not promptly provide copies of the records upon request. Castellon is entitled to request paper copies of public records, R.C. 149.43(B)(6), and ODRC is required to promptly provide those copies, R.C. 149.43(B)(1).

{¶ 13} Respondents argue that Castellon is not entitled to statutory damages because he did not initially identify with reasonable clarity the records he was requesting and once he did so (during meditation), respondents promptly provided the records. We agree and deny Castellon's request for statutory damages.

{¶ 14} "It is the responsibility of the person requesting public records to identify with reasonable clarity the records requested." *State ex rel. Mobley v. Tyack*, 2024-Ohio-2692, ¶ 7. Castellon, in his initial kite to Rose, listed a series of nine-digit numbers that he identified as "communications." Rose replied that depending on what Castellon was requesting—such as a kite or a grievance—he needed to provide dates or kite numbers for the items. Rose avers that without that information, he "was unable to determine what records [Castellon] was requesting" or on which system the records were kept. In addition, during mediation, ODRC realized that Castellon was requesting records related to a period of time when he was housed at a different correctional institution within ODRC's purview, underscoring Rose's inability to initially identify what records Castellon was requesting.

---

2. Effective April 9, 2025, R.C. 149.43 was amended such that a person committed to the custody of the Department of Rehabilitation and Correction is no longer eligible to receive an award of statutory damages under R.C. 149.43(C). 2024 H.B. No. 265. Here, we apply the version of R.C. 149.43(C) that was effective when Castellon made his public-records requests and filed his mandamus complaint. *See* 2023 Am.Sub.H.B. No. 33 (effective Oct. 3, 2023).

{¶ 15} The parties disagree about what happened after Rose requested additional information from Castellon. Castellon avers that he met with Rose in person, specifically identified the documents he was requesting, and submitted a cash slip but that Rose did not provide the copies. Rose disputes that assertion, averring that Castellon did not meet with him to clarify his public-records request. Other than the parties' affidavits, there is little evidence in the record to resolve this factual dispute. Castellon's evidence contains a copy of the cash slip that he claims he submitted to Rose for copying costs. But Rose avers that he keeps copies of all cash slips he processes, that he has no record of receiving one from Castellon, and that there is no corresponding deduction from Castellon's inmate account. Rose points out that the signature lines for "Approved By" and "Witnessed" on the slip are blank. In addition, in a kite Castellon sent Rose, Castellon mentioned that he had met with Rose to discuss his request, and Rose did not respond to that statement in his reply to the kite.

{¶ 16} A relator must prove entitlement to statutory damages by clear and convincing evidence, *Grim*, 2024-Ohio-4822, at ¶ 19, and when the evidence is evenly balanced, the relator has not satisfied this heightened burden of proof, *State ex rel. Ware v. Giavasis*, 2020-Ohio-5453, ¶ 32. We conclude that Castellon has not shown by clear and convincing evidence that he identified with reasonable clarity the records he was asking for in his November 2023 public-records request. Therefore, he is not entitled to statutory damages in connection with that request.

{¶ 17} On January 17, 2024, after his release, Castellon emailed a similar public-records request to ODRC. He requested copies of "the following public records/grievances" and then listed 28 different numbers. Three weeks later and before ODRC provided a substantive response, Castellon filed this mandamus action. Since then, ODRC has provided him with the requested records. Respondents argue that Castellon is not entitled to statutory damages in connection with this request because they did not fail to promptly provide documents and

Castellon did not clearly identify the records he was seeking until mediation. We agree.

{¶ 18} Respondents' failure to respond to Castellon's January 2024 public-records request before Castellon filed this mandamus action was not unreasonable. "R.C. 149.43(B) does not set forth a deadline by which a public office must respond to a request for copies of public records. The only requirement is that a copy be made available in a reasonable period of time." *State ex rel. Cincinnati Enquirer v. Deters*, 2016-Ohio-8195, ¶ 23. What is reasonable depends on all the pertinent facts and circumstances. *Id*. In his January 2024 request, Castellon listed 28 documents identified only by nine-digit numbers. We conclude that three weeks was not an unreasonable amount of time for ODRC to take to produce documents or otherwise respond to the request. *See State ex rel. Stuart v. Greene*, 2020-Ohio-3685, ¶ 8 (31 days was not an unreasonable time for public office to take before producing an 18-page document that required substantial redaction); *State ex rel. Shaughnessy v. Cleveland*, 2016-Ohio-8447, ¶ 17 (24 business days was not an unreasonable time for a public office to take before producing police reports in response to a request that required the office to search for, retrieve, and redact the reports).

{¶ 19} Three business days after Castellon filed his mandamus action, we referred the case to mediation. Respondents assert that only through speaking with Castellon during mediation were they able to identify the records that Castellon was seeking, and the parties agree that ODRC has provided Castellon with the requested documents. We conclude that respondents did not fail to comply with a duty under the Public Records Act by not responding to Castellon's January 2024 public-records request prior to the filing of his mandamus action and by not producing records in response to the request until mediation. Therefore, we deny Castellon's request for statutory damages in connection with that request.

### D. Attorney fees and court costs

**{¶ 20}** In his complaint, Castellon requested awards of attorney fees and court costs. He does not address these requests in his briefing, however, and has therefore waived them. *See Stuart* at ¶ 10 (waiver of request for court costs); *Mun. Constr. Equip.*, 2007-Ohio-3831, at ¶ 83 (waiver of request for attorney fees). Moreover, as a pro se litigant, Castellon is ineligible for an award of attorney fees. *Stuart* at ¶ 9. And he filed an affidavit of indigency, so he has not incurred court costs. *See State ex rel. Mobley v. Bates*, 2024-Ohio-2827, ¶ 16. Therefore, Castellon is not entitled to attorney fees or costs.

### III. CONCLUSION

**{¶ 21}** Because respondents have now provided Castellon with the public records he asked for, we deny Castellon's request for a writ of mandamus as moot. We also deny his requests for awards of statutory damages, attorney fees, and court costs, and we deny his motion for leave to file rebuttal evidence.

Writ denied as moot.

_____

**KENNEDY, C.J., concurring in part and dissenting in part.**

**{¶ 22}** I concur in the court's judgment to the extent that it denies relator Estephen Castellon's motion for leave to file rebuttal evidence, denies his complaint for a writ of mandamus as moot due to the production of the public records he requested, and denies his requests for attorney fees and court costs. I dissent, however, from the court's judgment to the extent that it denies his request for statutory damages.

**{¶ 23}** In my view, Castellon did reasonably identify the records he was seeking and has presented clear and convincing evidence showing that respondent Ohio Department of Rehabilitation and Corrections ("ODRC") improperly denied one of his public-records requests when submitted and failed to respond in a timely manner to two others, in violation of R.C. 149.43(B). Because the findings required

before we may deny or reduce statutory damages cannot be made in this case, I would award Castellon $3,000 in statutory damages. Therefore, I concur in part and dissent in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{¶ 24} "As with any petition for a writ of mandamus to compel production of public records, the devil is in the details, but the majority keeps no eye on the devil." *State ex rel. Teagarden v. Igwe*, 2024-Ohio-5772, ¶ 35 (Kennedy, C.J., concurring in part and dissenting in part).

{¶ 25} This opinion describes in detail a series of kite communications that Castellon transmitted to ODRC staff during his incarceration as well as several emails he sent to ODRC offices after his release. Although some of these kites and emails do not constitute or concern public-records requests, they are described below because they provide important context for Castellon's public-records requests.

{¶ 26} In my view, the evidence shows that Castellon transmitted four public-records requests to ODRC staff members or offices. Castellon does not seek relief based on his first public-records request—sent to the warden's administrative assistant, "Melton, D."—so it is described below only to provide context. Castellon's second public-records request was transmitted by electronic kite to respondent Inspector of Institutional Services Kelly Rose. Castellon's last two public-records requests were transmitted to ODRC by email: one to drc.publicinfo@odrc.state.oh.us and one to ODRC's Constituent Affairs Section.

{¶ 27} As explained below, regardless of where Castellon sent his public-records requests, no one produced the requested records in a timely manner.

*A. What a Kite Is*

{¶ 28} To understand this case, it is important to know what a kite is and what information a kite contains. A prison's kite system is "the means of two-way communication between all levels of staff and inmates." *State ex rel. McDougland*

*v. Greene*, 2020-Ohio-3686, ¶ 16. To transmit a kite, an incarcerated person must submit a form that has been created by ODRC. *Id.*

**{¶ 29}** To see what a kite looks like, look below for an image of the kite—No. 399301011—by which Castellon transmitted to Rose his second public-records request on November 27, 2023:



## Request #399301011

**Profile Photo:**

**Inmate Info**

Name: ESTEPHEN CASTELLON
Booking #: A704329
Nationality:
Submitted Date: 11/27/23 14:10
Submitted Room: RICI,H5,B,0124,0000/H5 - A&B
Submitted Facility: ODRC Richland CI
Current Room: RICI,H5,B,0124,0000/H5 - A&B
Current Facility: ODRC Richland CI
MAC ID: CC:4B:73:E4:89:AA
Device ID: CC4B73E4B9AA

**Form Info**

Category: Administration
Form: Kite - Inspector

**Request Info**

Status: CLOSED by Rose K.
Facility Deadline: 12/04/23 23:59

**Summary of Request:**

I need copies of my communications for legal purposes

**Details of Request:**

**Please state the nature of your kite. Be specific.:**
I need copies of the following communications for legal purposes: (AA said I had to get them from you)
384352051
393175581
380903401
397229081
378403741
378186531
340610831
329089501
317910161
317046711
398219281
277622421
274687951
334902351
334876341
398229621
398109281
398219281
397247741
397229081
393175581

000008

8/20/24, 10:34 AM         cc-snap.telmate.com/admin/grievances/documents/399301011?print_html=true&no_notes=true&

| DATE/TIME | USER | ACTION | DETAILS |
|---|---|---|---|
| 11/29/23 12:03 | ESTEPHEN CASTELLON | Viewed Staff Response | |
| 11/28/23 13:00 | ESTEPHEN CASTELLON | Viewed Staff Response | |
| 11/28/23 09:21 | Rose K. | Changed Status | From 'Open' to 'Closed' |
| 11/28/23 09:21 | Rose K. | Staff Response | For a copy of a kite, you will need to submit a Cash Slip (Maximum of 5 per week) to the Inspectors Office for 5 cents per page. Please list the Request Number on the Cash Slip so we can obtain the item and provide a copy. Copy's will take approximately 14 days. Copy's of Informal's Grievances and Appeals are free for the first copy (Maximum of 5 per week) which is logged with your case request when provided. You will need to kite with the specific case # you request and the item will be provided within 14 days. You will need to have your Officers call this Office BEFORE 9 am daily. You will need to bring the Cash Slip with you for your copy at that time. |
| 11/28/23 08:22 | ESTEPHEN CASTELLON | Viewed Staff Response | |
| 11/27/23 14:10 | ESTEPHEN CASTELLON | Submitted New | I need copies of my communications for legal purposes |

{¶ 30} At the top of the form, before the unique sequential number assigned to a kite, the form says "**Request**" in large font. (Boldface in original.) In the sections labeled "Summary of Request" and "Details of Request," the kite then shows all the information that the incarcerated person transmitted to ODRC staff in support of the request. In the Details of Request section, the incarcerated person is asked to be precise: "**Please state the nature of your kite. Be specific.**" (Boldface in original.)

{¶ 31} Equally important is the information contained in the boxes of the chart that appears at the bottom of the form. The columns bear the following headers (boldface and capitalization in original) and display the following information:

- "**DATE/TIME**": shows the dates and times of each event in the life of the kite—e.g., when the kite was transmitted, responded to, and closed;
- "**USER**": identifies the person responsible for each event;
- "**ACTION**": shows the nature of the event;

12

- **"DETAILS":** shows the content if the event is the submission of a kite or a response.

With this understanding, I turn to the evidence in this case.

### B. Transfer from Noble Correctional Institution

**{¶ 32}** In late October 2023, Castellon was transferred from the Noble Correctional Institution to the Richland Correctional Institution. Prior to his transfer, Castellon was charged with two rule infractions, which he challenged. Upon review, the Legal Services Division found that the evidence was insufficient to support the charges.

### C. Communications during Incarceration

**{¶ 33}** The first relevant kite Castellon transmitted to Rose—No. 384352051—on November 7 gives us the context from which this case arose. In the Details of Request section, he stated, "I was sentenced to 7 years. I was arrested Dec 5th 2016. The sentencing judge updated my jail time credit journalized 7/26/23. My outdate 12/18/23 is incorrect. Recalculation is imperative."

**{¶ 34}** Rose closed the kite the next day, stating that Castellon's concern is "non-grievable in accordance with AR 5120-9-31 as it is regarding (H)." Rose then advised Castellon that improper use of the grievance procedure could result in restricted access and advised him on what issues were subject to grievance.

### 1. November 22 through December 1:
### Castellon's first two public-records requests

**{¶ 35}** On November 22, Castellon transmitted kite No. 398229621 to Melton, requesting 15 public records. In the Summary of Request section, Castellon indicated, "My communications." In the Details of Request section, he stated, "I need copies of the following communications for legal purposes." Castellon then listed the following numbers: 384352051, 393175581, 380903401, 397229081, 378403741, 378186531, 340610831, 329089501, 317910161, 317846711, 398219281, 277622421, 274687951, 334902351, and 334876341.

**{¶ 36}** On November 27, Melton closed the kite Castellon submitted on November 22. In closing the kite, Melton stated, "You have to get *them* from the inspector." (Emphasis added.)

**{¶ 37}** Less than two hours later, Castellon transmitted to Rose kite No. 399301011, an image of which appears above in Part I(A) of this opinion. In the Summary section, Castellon repeated, "I need copies of my communications for legal purposes." In the Details section, Castellon restated, "I need copies of the following communications for legal purposes." He then added, "(A[dministrative] A[ssistant] said I had to get them from you)." Next, Castellon again listed a series of numbers, this time the following 21 numbers: 384352051, 393175581, 380903401, 397229081, 378403741, 378186531, 340610831, 329089501, 317910161, 317846711, 398219281, 277622421, 274687951, 334902351, 334876341, 398229621, 398109281, 398219281, 3979247741, 397229081, and 393175581.

**{¶ 38}** The next day, on November 28, Rose closed the kite stating:

> For a copy of a kite, you will need to submit a Cash Slip (Maximum of 5 per week) to the Inspectors Office for 5 cents per page. Please list the Request Number on the Cash Slip so we can obtain the item and provide a copy. Copy's will take approximately 14 days. Copy's of Informal's Grievances and Appeals are free for the first copy (Maximum of 5 per week) which is logged with your case request when provided. You will need to kite with the specific case # you request and the item will be provided within 14 days. You will need to have your Officers call this Office BEFORE 9 am daily. You will need to bring the Cash Slip with you for your copy at that time.

(Capitalization and punctuation in original.)

{¶ 39} Later that day, in response to the message Rose sent when closing Castellon's November 27 kite, Castellon transmitted kite No. 399615901 to Rose. In the Summary section, Castellon again indicated, "[C]opies of my communications for legal purposes." In the Details section, Castellon stated, "I can pay the 5 cents per page[;] however, my out date is 12/18/23 subject to change to 12/4 soon as my jail time credit is recalculated. I need the copies this week."

{¶ 40} In closing this kite the next day, on November 29, Rose stated, "Bring Cash Slip and the *proper numbers or dates for the items*—Have your Office[rs] or Unit Staff contact this Office PRIOR to 9 am for a meeting. After 9 am we have position responsibilities to attend to such as case research, meetings, trainings and general facility issues. We are unable to meet after 9 am." (Emphasis added and capitalization in original.)

{¶ 41} At 8:00 a.m. on November 30, Castellon was issued an inmate pass granting him permission to go to the inspector's office.

{¶ 42} Later that day, just after 7:00 p.m., Castellon transmitted kite No. 400401901 to Rose. Castellon repeated in the Summary section, "My communications for legal purposes." In the "Be specific" (i.e., Details) section, he stated:

> You told me to come to your office to get my grievances and kites[,] after I let you know I am being released very soon and would not have time to get 5 per week. *In your office you said you weren't going to stop what you were doing to print my grievances and that since I was getting out I would have printable access to all my communications. You also said it was posted or sent as a message; I'm having a hard time verifying this all access that you speak of.* I

15

only ask to avoid a public records request. That would be very frustrating.

(Emphasis added.)

**{¶ 43}** Rose closed this kite the next day, stating: "Via[P]ath [the vendor of the elecronic tablets that are provided to incarcerated persons] is a huge business and [is] not going anywhere. All of your documents WILL be available to you. This is verifiable. Feel free to kite Via-path with your concerns." (Capitalization in original.)

### 2. November 23 through December 18: Castellon's grievances

**{¶ 44}** On November 23, the day after Castellon sent Melton his first public-records request, Castellon transmitted grievance No. 398499841. ODRC assigned the grievance identification No. RiCI000000001482. Below is an image of the first page of this grievance:

3/15/24, 2:26 PM    cc-snap.telmate.com/admin/grievances/documents/batch_print?authenticity_token=89yjZXRhMA%2F32xLbUiy%2B2ZKgz0Riy4%...

**Grievance #398499841**

**Inmate Info**

Name: ESTEPHEN CASTELLON
Booking #: A704329
Nationality:
Submitted Date: 11/23/23 17:55
Submitted from Location/Room: RICI,H5,B,0124,0000/H5 – A&B
Submitted Facility: ODRC Richland CI
Current Location/Room: RICI,H5,B,0124,0000/H5 – A&B
Current Facility: ODRC Richland CI
MAC ID: CC:4B:73:E4:B9:AA
Device ID: CC4B73E4B9AA

**Form Info**

Category: Mail / Package
Form: Delay / failure in sending

**Grievance Info**

Grievance ID #: RICI000000001482
Status: CLOSED by Melton U.
Duplicated By: 404646091
Facility Deadline: 01/14/24 23:59
Grievance Level: Appeal
Inmate can reply: No
Disposition @ ICR:
Disposition @ Grievance: Denied - insufficient evidence to support claim

**Summary:**

2 Cashslips submitted 11/16/23

**Details:**

**Please state the nature of your Informal Complaint Request (ICR). Be specific.:**
I submitted 2 parcels into the package room on 11/16/23. Legal documents: one going to the 6th circuit and the other to the northern district. Upon receipt of the cashslips I notice that someone crossed out the date I wrote indicating the date I handed them in 11/16/23; and replaced it with the date processed 11/20/23. I need the cameras ran back and confirmation that the parcels were submitted on 11/16/23. I also need the name of the staff that altered the dates.

| DATE/TIME | USER | ACTION | DETAILS |
|---|---|---|---|
| 12/18/23 11:20 | Melton U. | Changed Status | From 'Open' to 'Closed' |
| 12/18/23 11:20 | Melton U. | Changed Disposition | Changed Disposition for level Appeal with value '' to 'Affirmed' |
| 12/18/23 11:20 | Melton U. | Staff Response | The Office of the Chief Inspector is in receipt of your Appeal to the Chief Inspector. A thorough review of your appeal has been completed which included the following factors: • Procedural requirements met. • Proper investigation of your grievance was conducted. • Applicable policies, administrative rules, directives and ODRC operating manuals utilized. • Additional or refuting information presented in your appeal. |

https://cc-snap.telmate.com/admin/grievances/documents/batch_print?authenticity_token=89yjZXRhMA%2F32xLbUiy%2B2ZKgz0Riy4%2Fk8%2B...    13/34

027

{¶ 45} As the above image shows, ODRC's grievance form is similar in appearance and structure to a kite. It is sequentially numbered and provides space for the incarcerated person to explain the substance of the grievance.

{¶ 46} But the grievance form also has features that distinguish it from the kite form. First, the heading at the top of the grievance form is not "**Request**" but

"**Grievance**." (Boldface in original.) Second, the Details prompt of the form reads, "**Please state the nature of your Informal Complaint Request (ICR). Be specific.**" (Boldface in original.) Third, there is a "**Grievance Info**" section, which prompts a "**Grievance ID #.**" (Boldface in original.)

{¶ 47} In the Summary section of the above grievance, Castellon stated, "2 Cashslips submitted 11/16/23." In the Details section, Castellon indicated the following:

I submitted 2 parcels into the package room on 11/16/23. Legal documents: one going to the 6th [C]ircuit and the other to the [N]orthern [D]istrict. Upon receipt of the cashslips I notice that someone crossed out the date I wrote indicating the date I handed them in 11/16/23[,] and replaced it with the date processed 11/20/23. I need the cameras ran back and confirmation that the parcels were submitted on 11/16/23. I also need the name of the staff that altered the dates.

The chart at the bottom of the grievance indicates that Castellon checked the status of the grievance multiple times between November 24 and December 1.

{¶ 48} "Keith, D." responded to Castellon's grievance on December 2. Keith asked Castellon whether he remembered what time he went to the package room on November 16.

{¶ 49} On December 4, Castellon replied to Keith's response by transmitting kite No. 401427791. In the Summary section, he indicated, "Informal complaint." In the Details section, Castellon stated: "Rici000000001482[.] Someone asked me what time I submitted my legal mail to the package room. The grievance is not giving me an option to reply. I submitted it the morning of 11/16/23. Please attach this to the grievance."

{¶ 50} Rose closed this kite later that day, stating: "We need to meet on this issue soon!  We are here to meet with you and discuss the issue.  Have your Office[rs] or Unit Staff contact this Office PRIOR to 9 am for a meeting." (Capitalization in original.)

{¶ 51} Two days later, on December 6, Castellon transmitted kite No. 401889371, indicating in the Summary section: "Complaint: RiCI000000001482. Meeting."  In the "Be specific" (i.e., Details) section, he stated, "Regarding RiCI000000001482: As per your previous response to my grievance[:] I can come to your office ASAP[;] however, the court has already found the documents in question to be untimely so whatever conversation we have must be recorded to protect my evidentiary concer[ns].  Thank you."

{¶ 52} Rose closed this kite later that day, stating:

Residents do not have the ability to request a conversation be record[ed] nor do we have the equipment just laying around to perform this.  If you filed an issue you obviously are seeking assistance.  [T]he only way to do that is to meet and discuss.  We do not want to keep going back and forth on this platform as it is too much.  Have you[r] Office[rs] or Unit Staff contact this Office PRIOR to 9 am for a meeting.

(Capitalization in original.)

{¶ 53} Meanwhile, on that same day, Keith closed grievance No. 398499841, stating, "Due to waiting on response from you I will be closing this out[.]  If this is still a[n] issue submit a new kite."  The chart, however, records a response from Castellon, with "Escalated" indicated in the Action column.  In the Details column, Castellon stated: "I submitted the parcels the morning of 11/16/23.  Not the 20th.  The fact that the 20th is the process date proves that there is a serious

issue[,] as mail is NEVER processed the same day. The cameras will show me submitting them on the 16th. I need confirmation for the courts. Reason: Inadequate investigation." (Capitalization in original.)

{¶ 54} The next day, on December 7, Rose responded to Castellon's escalation of the grievance, stating: "We need the Cash Slip in question. Please bring to us ASAP—Have your Office[rs] or Unit Staff contact this Office PRIOR to 9 am for a meeting. After 9 am we have position responsibilities to attend to such as case research, meetings, trainings and general facility issues. We are unable to meet after 9 am." (Capitalization in original.) A short time later, Rose responded again, asking Castellon whether he could recall what time he went to the package room on November 16 because upon review, the video footage recorded that day did not show that he went there. Shortly thereafter, Rose uploaded a document entitled Castellon Cash Slips.pdf; the chart indicates that the document was not shared with Castellon.

{¶ 55} Later that day, Castellon transmitted to Rose kite No. 402360771, which refers to "Grievance RiCI000000001482" in the Summary section. In the Details section, Castellon stated:

On 11/16/23 I left the dorm at 9:48 am so I was in the package room around 9:50 am submitting my notice of appeal to the Dist[.] Court Northern and the 6th [C]ir[.] (please attach this to the grievance as there is no option for me to reply).

Honestly I don't trust you[;] I need any conversation on this subject recorded (the last time I was in administration for a "meeting" I was falsely accused sent to the hole for 18-days and transferred here). All I need is confirmation that the parce[ls] were sent the 16th so I can cure the untimely filing. Thank you.

**{¶ 56}** Rose closed this kite the next day, repeating: "Last request—Cash Slip Needed!  Have your Unit Team contact this Office prior to 9 am for us to meet and discuss further."

**{¶ 57}** The last kite Castellon transmitted to Rose that is in the record—No. 403160021—was sent on December 10.  In the Summary section, Castellon indicated, "Grievance RiCI000000001482."  In the Details section, he stated:

> The responder [to] the grievance asked me for the time that I submitted the parcels to the package room[;] however, the system is not giving me an option to reply so I kited you with the time 950am[-]ish.  I asked you to attach the kites to the grievance; you have not.  You have access to the original cash slip yet you keep telling me to bring the slips in.  It is illogical for me to bring you evidence that you have access to.  Your refusal to investigate is frustrating my access to the court.  Please attach this to the grievance.

**{¶ 58}** Rose closed the kite the next day, stating:

> This issue is too extensive to type and or to continue discussing in this platform.  This would be much better discussed in a person-to-person meeting.  We are here to meet with you and discuss the issue.  Have your Office[rs] or Unit Staff contact this Office PRIOR to 9 am for a meeting.  After 9 am we have position responsibilities to attend to such as case research, meetings, trainings and general facility issues.  We are unable to meet after 9 am.

(Capitalization in original.)

**{¶ 59}** Thereafter, Rose and Castellon communicated only through grievance No. 398499841. On December 14, Rose changed the disposition status of the grievance to "Denied—insufficient evidence to support claim." In closing the grievance, Rose recounted the events that led to Castellon's filing the grievance and the steps ODRC officials had taken to investigate the allegations. Rose then added: "The Facility Video System is not a tool for the residents to request for their review and possession. A Cash Slip dated by Offenders is commonly mis-dated and or not correct for the PROCESS DATE." (Capitalization in original.) Rose continued, describing the schedule for picking up outgoing mail from the package room. He then admitted that he had obtained copies of Castellon's cash slips from the cashier's office and that those cash slips had been "uploaded to this case." Rose closed the grievance by concluding that there was insufficient evidence to establish that either an inappropriate action or a violation of state policy or administrative or institutional rule had occurred.

**{¶ 60}** The next day, on December 15, Castellon appealed the denial of his grievance, stating:

> The investigation is inadequate. In order to muddy the waters the responders are focusing on the processing date. Cash slips have two dates for a reason; the date at the top of the slip is the date that the parcels are submitted to the institution. The at hand issue is that a RiCI staff member crossed out that date and replaced it with the processing date (this is called fraud).

Castellon identified a series of his previously sent kites concerning the grievance: Nos. 403160021, 401889371, and 401427791. He also asserted that the staff's refusal to act was a common event.

{¶ 61} On December 18, Melton closed the grievance by stating that Rose's decision had been affirmed. Melton asserted that the investigation had failed to substantiate "any violation of policy, rule, or law."

### D. Communications after Release

{¶ 62} After his release from prison, on January 17, 2024, Castellon sent to the address odrccustomerhelp@gtl.net an email stating merely: "I was recently released. I need access to my grievances." Later that day, Castellon transmitted his third public-records request, seeking 28 specified public records to ODRC through its drc.publicinfo@odrc.state.oh.us email address. The numbers he listed are 384352051, 393175581, 380903401, 397229081, 378403741, 378186531, 340610831, 329089501, 317910161, 317846711, 398219281, 277622421, 274687951, 398109281, 398219281, 398229621, 334902351, 334876341, 334876511, RiCI000000001482, 332458031, 397247741, 397229081, 393175581, 334702531, 334570181, 334287491, and 334028461. Castellon added: "There are a few kites and grievances from November 2024 through December in which I do not have the communication #[;] however, I need them as well." Castellon did not receive a response from ODRC to this email.

{¶ 63} Castellon says that on January 30, he transmitted a fourth public-records request by emailing ODRC's Constituent Affairs Section. The actual request is not in the record, but Castellon states that he again sought his kites. In response to that request, Castellon received an email from the address odrc@drc.iqgov.com stating:

Thank you for contacting the Ohio Department of Rehabilitation and Correction, Constituent Affairs Section. We have received your inquiry, question, or concern and will respond accordingly. Should there be any further inquiries, questions, or

concerns please click the link to be redirected for a new submission.

Thank you.

{¶ 64} A few minutes later, Castellon received a second response, stating: "I have contacted the legal department that handles public information requests. They should assist you further. Thank you." That was the last response Castellon received from ODRC.

{¶ 65} On February 8, Castellon requested relief from this court by filing this action for a writ of mandamus under R.C. 149.43(C)(1)(b).

### E. Affidavit of Kelly Rose

{¶ 66} Rose has submitted as evidence an affidavit sworn to on August 26, 2024. Rose avers that he has been the inspector of institutional services at the Richland Correctional Institution since 2000. His primary duties are to respond to kites; provide institutional inspection services; conduct intake orientation for incarcerated persons; provide staff training and new-employee orientation; and investigate grievances, allegations of inappropriate supervision, use-of-force claims, and property-loss complaints. Rose also serves as the point of contact for ViaPath, ODRC's vendor of the tablets provided to incarcerated persons, and responds to public-records requests, including requests for copies of kites and grievances.

{¶ 67} In approximately June 2023, ODRC migrated to ViaPath from JPay, its prior tablet vendor. As the institutional inspector, Rose has access to all grievances and kites that incarcerated persons submit through their tablets at the Richland Correctional Institution.

{¶ 68} Rose admits that Castellon was transferred from the Noble Correctional Institution to the Richland Correctional Institution in October 2023.

{¶ 69} Rose avers that in the kite Castellon sent him on November 27, requesting copies of communications, Castellon listed a series of 21 numbers

"without further explanation." Rose further avers that he "was unable to determine what records [Castellon] was requesting" because Castellon "did not identify the dates or timeframes the communications were sent, which made it impossible to determine whether they were maintained in the old tablet system, JPay, or the new tablet system ViaPath."

{¶ 70} Rose notes that he responded to Castellon the next day, explaining "the process of requesting and paying for records" and instructing Castellon to obtain permission to meet with him in his office. Rose denies the assertions Castellon made in his November 30 kite—that Castellon came to his office and that he told Castellon there that he would not stop what he was doing to print the requested records. Instead, Rose avers, when responding to that kite on December 1, he informed Castellon that "if he felt that his *kites* would not be available following his release," he could contact ViaPath about the availability of his kites after his release. (Emphasis added.)

{¶ 71} Rose next avers that on December 6 and 7, he invited Castellon to come to his office to "clarify" what records Castellon was seeking. Rose notes Castellon's demand that any conversation he had with Rose be recorded and Rose's response claiming that the Richland Correctional Institution does not have the ability to record conversations. Rose avers that he does not know which parcels Castellon was referring to when he stated on December 7 that he needed "confirmation that the parce[ls] were sent the 16th so [he] c[ould] cure the untimely filing."

{¶ 72} Rose also avers that he has "never refused a request or otherwise denied a request to print off a grievance, kite, or informal complaint" and that he works to "provide paper copies of all documents *when requested in good faith*." (Emphasis added.) Rose further avers that Castellon "never presented a cash slip to [him]" and "never met with [him] or explained what he was requesting in his

initial request from November 27, 2023." "I have made every attempt to clarify the request he made," Rose asserts, and "he refused to provide any clarification."

{¶ 73} Finally, Rose avers that after reviewing Castellon's complaint for writ of mandamus, he was still unable to identify the records Castellon was requesting. According to Rose, it was not until after speaking with the Ohio Attorney General's Office in April 2024 while the case was in mediation that Rose understood Castellon's public-records request and produced the records he had requested. (The affidavit has an apparent typographical error when it says "April 2023.")

## II. LEGAL ANALYSIS

{¶ 74} Although all the records Castellon requested have been produced, the question whether he is entitled to statutory damages remains. Respondents say no, on two bases, focusing on the November 27, 2023 public-records request. First, they argue that the records Castellon requested were not reasonably identifiable. Second, they contend that once the records were properly identified, they were timely produced. The majority agrees with respondents in both respects, finding that (1) respondents did not know or understand until mediation with Castellon what records his November 2023 public-records request was referring to because he had failed to "identify [them] with reasonable clarity," majority opinion, ¶ 16, and (2) ODRC's failure to respond to Castellon's January 2024 public-records requests for three weeks was not unreasonable.

{¶ 75} I disagree. In my view, the majority's conclusions are contrary to the record and the law.

*A. The Public Record Act*

{¶ 76} Under the Public Records Act, R.C. 149.43, the duties of a public office or person responsible for requested public records are straightforward.

{¶ 77} Upon receipt of a public-records request, the public office or person responsible for the requested records has a legal duty to "promptly" prepare and

make available "all public records" responsive to the request. R.C. 149.43(B)(1). This provision reiterates the temporal aspect of the act in the next sentence: "[U]pon request by *any person*, a public office or person responsible for public records shall make copies of the requested public record available to the requester at cost and within a *reasonable period of time*." (Emphasis added.)

{¶ 78} The General Assembly did not define the term "reasonable period of time" in R.C. 149.43. The word "reasonable," however, means "[w]ithin sensible or rational limits; not excessive; moderate." *Black's Law Dictionary* (12th Ed. 2024). And this court has held in a public-records case that "'the determination of what is reasonable depends upon all the pertinent facts and circumstances.'" *State ex rel. Kesterson v. Kent State Univ.*, 2018-Ohio-5108, ¶ 16, quoting *State ex rel. Cincinnati Enquirer v. Deters*, 2016-Ohio-8195, ¶ 23.

{¶ 79} The Public Records Act also provides that if a public-records request is "ambiguous or overly broad" or if "the public office or the person responsible for the requested public record *cannot reasonably identify what public records are being requested*, the public office or the person responsible for the requested public record may deny the request *but shall provide the requester with an opportunity to revise the request by informing the requester of the manner in which records are maintained by the public office and accessed in the ordinary course of the public office's or person's duties*." R.C. 149.43(B)(2). (Emphasis added.)

{¶ 80} The "use of the term 'shall' in a statute or rule connotes a mandatory obligation unless other language evidences a clear and unequivocal intent to the contrary." *State ex rel. Cincinnati Enquirer v. Lyons*, 2014-Ohio-2354, ¶ 28, citing *Dorrian v. Scioto Conservancy Dist.*, 27 Ohio St.2d 102 (1971), paragraph one of the syllabus, among other cases. Based on the language of R.C. 149.43(B)(1), "when an employee of a public office or any person responsible for the public office's public records receives a public-records request, a joint duty arises for either the public office or a person responsible for public records to respond to it."

(Emphasis deleted.) *State ex rel. Berry v. Booth*, 2024-Ohio-5774, ¶ 51 (Kennedy, C.J., concurring in part and dissenting in part). A "public office—through its employees—or a person responsible for public records" must either respond to the request in accordance with R.C. 149.43 or forward the request to the person who should respond. *See id.* at ¶ 72.

**{¶ 81}** Statutory damages are awarded against a public office or person responsible for public records for a failure to comply with any of the requirements of R.C. 149.43(B). R.C. 149.43(C)(1).[3] Under R.C. 149.43(C)(2), statutory damages are awarded at a rate of $100 "for each business day during which the public office or person responsible for the requested public records failed to comply with an obligation in accordance with [R.C. 149.43(B)], beginning with the day on which the requester files a mandamus action to recover statutory damages, up to a maximum of one thousand dollars."

**{¶ 82}** Under R.C. 149.43(C), "the court may reduce an award of statutory damages or not award statutory damages" if it makes two findings: (1) that a well-informed records custodian reasonably would believe that he or she had complied with R.C. 149.43(B), and (2) that a well-informed records custodian reasonably would believe that his or her actions served the public policy reflected in the Public Records Act. *See* R.C. 149.43(C)(2)(a).

**{¶ 83}** For determining entitlement to statutory damages, the Public Records Act ties together the issues whether a public-records request was "reasonably identif[iable]," R.C. 149.43(B)(2), and whether a public office or person responsible for the public record "promptly" prepared and produced the requested records within a "reasonable period of time," R.C. 149.43(B)(1).

---

3. Effective April 9, 2025, the Public Records Act was amended such that a person committed to the custody of the Department of Rehabilitation and Correction is no longer eligible to receive an award of statutory damages under R.C. 149.43(C). 2024 H.B. No. 265. Here, however, we apply the version of the act that was in effect when Castellon made his public-records requests and filed his complaint. *See* 2023 Am.Sub.H.B. No. 33 (effective Oct. 3, 2023).

*B. Castellon Is Entitled to Statutory Damages*

{¶ 84} As explained below, based on a complete review of the record in this case, I would conclude that Castellon reasonably identified the particular records he requested on November 27, 2023, and that ODRC failed to respond to his January 2024 public-records requests in a timely manner. Therefore, Castellon is entitled to statutory damages.

**1. The public records requested on November 27, 2023, were reasonably identifiable**

{¶ 85} Respondents argue that they had no clear legal duty to produce the records Castellon requested on November 27, 2023, contending that he did not reasonably identify the records and that he refused to cooperate with ODRC's attempts to clarify the request. As explained below, in support of their argument, respondents assert that Castellon (a) listed a series of numbers "without further explanation and detail," (b) failed to identify the "dates or timeframes" of the communications, and (c) thwarted respondents' "good faith" efforts to clarify the request.

*a. Castellon provided explanations and details*

{¶ 86} Rose avers that he was unable to determine what records Castellon's November 27, 2023 public-records request was referring to because all Castellon provided was a series of numbers without explanation. Without explanation, Rose avers, there was no way to tell which type of records Castellon was requesting— i.e., kites or grievances. Rose states that he did not know what Castellon was asking for until he received clarification from the Ohio Attorney General's Office in April 2024 while the case was in mediation. But as noted below, Castellon did provide an explanation detailing the records he was requesting, and Rose admits that by November 30, 2023, he knew what Castellon was requesting (although the evidence shows that Rose actually knew by November 28).

{¶ 87} Castellon described the records he was seeking in the Summary section of his November 27 kite, stating that he was requesting "[his] communications." Would anyone believe that Castellon's use of the word "communications" instead of "kite" made his request unclear? Would anyone believe that the numbers Castellon listed in his public-records request to identify the "communications" with ODRC staff he was requesting were anything but kite numbers? The answer to both questions is no.

{¶ 88} In all three kites Castellon transmitted between November 27 and 30 to Rose, Castellon stated that he was requesting copies of "[his] communications for legal purposes." Castellon also provided Rose with the kite numbers, so what more did Rose need?

{¶ 89} Melton certainly knew what Castellon was requesting when he received Castellon's first public-records request, on November 22. Castellon told Melton in that kite, "I need copies of the following *communications* for legal purposes," then listed the following numbers: 384352051, 393175581, 380903401, 397229081, 378403741, 378186531, 340610831, 329089501, 317910161, 317846711, 398219281, 277622421, 274687951, 334902351, 334876341." (Emphasis added.) Instead of providing the requested records, Melton closed the kite, stating, "You have to get *them* from the inspector." (Emphasis added.)

{¶ 90} "[T]hem." Does anyone think Melton did not know which type of records Castellon was requesting when Melton said "them"? If Melton did not know what type of records Castellon was requesting, why would Melton refer Castellon to Rose? And with that, Castellon went to Rose and got the proverbial run-around.

{¶ 91} Rose's initial response to Castellon's second public-records request, received on November 27, shows he knew that Castellon was requesting kites and maybe also grievances. In response, Rose told Castellon that a copy of a kite would cost him five cents a page and that a copy of a grievance would be free of charge.

If Castellon wanted a grievance, Rose told him, he would "need to kite with the specific case # [he was] request[ing]."

{¶ 92} Castellon responded to Rose on November 28, stating: "I can pay the 5 cents per page." Castellon did not say anything else; he certainly did not provide Rose with a "specific case [number]" for a grievance.

{¶ 93} So, even if, for the sake of argument, Rose did not know whether the series of numbers listed in Castellon's November 27 kite referred to kites or grievances, Castellon's response to Rose on November 28 clarified the type of records he was requesting by saying that he could pay the five cents a page charged for a copy of a kite. Therefore, it was clear that by requesting "communications," Castellon meant kites.

{¶ 94} Rose even admits that he knew by November 30 that Castellon was requesting copies of kites. In his affidavit, Rose states that on that date, he "responded to [incarcerated person] Castellon's message and informed him that he could kite ViaPath directly if he felt that his *kites* would not be available following his release." (Emphasis added.) So, Rose, by his own admission, knew on November 30 that by requesting his "communications," Castellon meant kites. Rose did not need the attorney general's office to tell him in April 2024 which type of records Castellon was requesting, because Rose already knew.

### b. Dates and timeframes were unnecessary

{¶ 95} In arguing that Castellon failed to reasonably identify the records he requested on November 27, 2023, Rose also contends that Castellon failed to specify the timing of the requested communications. Rose avers that the numbers Castellon listed in his November 27 kite to identify the communications he was requesting "did not identify the dates or timeframes the communications were sent, which made it *impossible* to determine whether they were maintained in the old tablet system, JPay, or the new tablet system ViaPath." (Emphasis added.) Citing *State ex rel. Mobley v. Tyack*, 2024-Ohio-2692, ¶ 7, respondents rely on this

averment to argue that Castellon failed to fulfill his "responsibility . . . to identify with reasonable clarity the records requested."

{¶ 96} There are three problems with Rose's averment and respondents' argument.

{¶ 97} First, Rose had already told Castellon that all Rose needed were the numbers assigned to the communications. On November 29, in closing Castellon's November 28 kite, Rose stated, "Bring Cash Slip and the proper numbers *or* date for the items." (Emphasis added.) The "use of the word 'or,' a disjunctive term, signifies the presence of alternatives." *In re Estate of Centorbi*, 2011-Ohio-2267, ¶ 18; *accord* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012). Rose did not tell Castellon that he needed the proper numbers *and* dates for the items. So, at least four months before Rose produced the records, Castellon provided Rose what he had asked for: the numbers assigned to the communications.

{¶ 98} Second, according to Rose, the Richland Correctional Institution migrated from JPay to ViaPath in June 2023. Rose admits that Castellon was not transferred to the Richland Correctional Institution until October 2023. Rose also avers that he can access only records maintained at the Richland Correctional Institution. Therefore, Rose could not have been confused about where to find the communications Castellon was requesting. Rose knew that all of Castellon's communications at the Richland Correctional Institution were accessible on ViaPath, not JPay. And that is why Rose told Castellon in closing his November 30 kite that he could access all his communications on ViaPath after his release: "Via-path is a huge business and are not going anywhere. All of your documents WILL be available to you. This is verifiable. Feel free to kite Via-path with your concerns." (Capitalization in original). In his affidavit, Rose also admits that in this response, he suggested that Castellon contact ViaPath "if he felt that his kites would not be available following his release."

{¶ 99} Lastly, think about this: If Rose had actually been confused about which system contained the communications Castellon was requesting—which he was not—then why did Rose submit to this court evidence showing that Castellon did not contact ViaPath about his kites? What difference does it make whether Castellon contacted ViaPath? What difference does it make if Castellon decided not to contact ViaPath if no one knew whether the kites Castellon was requesting were stored on JPay or ViaPath? This is a nonstarter. And if Rose did not know which system contained Castellon's kites, then why did he tell Castellon on November 30 to contact ViaPath? The truth is that Rose knew exactly which system contained Castellon's kites: ViaPath, not JPay.

### c. Respondents did not make good-faith attempts to clarify

{¶ 100} As their third and final argument in support of their position that Castellon failed to reasonably identify the records he requested on November 27, 2023, respondents contend that they made "good faith" attempts to clarify the request and that Castellon refused to cooperate. Respondents contend that Castellon did not present evidence to support his allegation that the length of time they took to "clarify his vague request, coordinate with multiple public information officers and identify the records was unreasonable." Moreover, respondents say that any delay in producing the records was Castellon's fault because of his "refusal" to clarify the records he was requesting. Rose avers that he did not understand what type of records Castellon's request was referring to, that he therefore invited Castellon to come to his office to clarify the request, and that Castellon refused to do so. Rose also avers that Castellon never presented him with a cash slip, which is required for copying records, and he notes that the signature lines for "Approved By" and "Witnessed" on the cash slip Castellon submitted as evidence are blank.

{¶ 101} Relying on these averments and citing R.C. 149.43(B)(2) (requiring that the requester be provided with "an opportunity to revise the request" if the

records being requested cannot be reasonably identified), respondents argue that Rose's responses to Castellon's kites reflect that Rose was simply following that provision. But Rose's averments and respondents' reliance on R.C. 149.43(B)(2) are fatally flawed, for *five reasons*.

{¶ 102} *First*, Rose's averments that he asked Castellon to clarify the records he was requesting are inconsistent with Rose's actual responses to the three kites Castellon sent between November 27 and 30. In closing those kites, Rose did not tell him that his public-records request was "ambiguous" or "overly broad" or that the requested records were not "reasonably identif[iable]," R.C. 149.43(B)(1). Rose did not even tell Castellon that he did not understand the request, nor did he ask him to restate or clarify it. Instead, as noted above, Rose closed the November 27 kite by stating that the cost of a copy of a kite was five cents a page and that a copy of a grievance was free but that Castellon would have to provide the particular identification number if he was requesting a grievance.

{¶ 103} In response to that message, Castellon transmitted a kite in which he did not provide an identification number but instead said that he could pay the five cents a page for the cost of the record. Therefore, Rose knew on November 28 that Castellon was seeking copies of kites; in fact, two days later, he told Castellon that he would be able to obtain his kites from ViaPath after his release. Rose's affidavit, in which he admits that his response to Castellon had to do with the availability of "kites," confirms that Rose was not confused about what type of records Castellon was requesting.

{¶ 104} In closing the November 28 kite, Rose stated, "Bring Cash Slip and the proper numbers or dates for the items." In closing the November 30 kite, Rose told Castellon that ViaPath would have all his documents and that he would be able to access them.

{¶ 105} *Second*, Rose's portrayal of the responses he sent Castellon on December 6 and 7 as attempts to "clarify" Castellon's public-records request is pure

propaganda. These communications did not have anything to do with Castellon's public-records request; they concerned the grievance Castellon filed on November 23. As the inspector of institutional services, Rose knew that his December 6 and 7 communications concerned the grievance because he was responsible for investigating grievances.

{¶ 106} That grievance was assigned identification No. RiCI000000001482. In the grievance, Castellon alleged that on November 16, he submitted to the package room two parcels: one containing documents to be filed in the United States Court of Appeals for the Sixth Circuit and the other containing documents to be filed in the United States District Court for the Northern District of Ohio. Castellon stated that he had written November 16, indicating the date of submission to the package room, on the cash slips he had filled out for the mailings and that "someone [had] crossed out" that date and had replaced it with November 20—the date the parcels were processed. Accordingly, Castellon asked for confirmation that the parcels were submitted on November 16 and for the name of the staff member who had allegedly altered the cash slips because the courts had found his legal documents to have been untimely filed.

{¶ 107} The first time ODRC staff responded to this grievance is December 2. At that time, Keith asked Castellon whether he remembered what time he went to the package room on November 16 because the footage Keith had reviewed did not show that Castellon went there on that date.

{¶ 108} On December 4, 6, 7, and 10, Castellon transmitted kite Nos. 401427791, 401889371, 402360771, and 403160021, respectively, to Rose. In the Summary section of each of these four kites, Castellon indicated, "Informal complaint" (i.e., a grievance), "Complaint: RiCI000000001482," or "Grievance RiCI000000001482." Moreover, in the Details section of each kite, Castellon provided affirmative statements showing that the kites concerned the grievance with identification No. RiCI000000001482:

- In kite No. 401427791, Castellon stated: "Someone asked me what time I submitted my legal mail to the package room. The grievance is not giving me an option to reply. I submitted it the morning of 11/16/23. Please attach this to the grievance."

- In kite No. 401889371, Castellon stated: "Regarding RiCI000000001482: As per your previous response to my grievance. I can come to your office ASAP[;] however, the court has already found the documents in question to be untimely so whatever conversation we have must be recorded to protect my evidentiary concer[ns]. Thank you."

- In kite No. 402360771, Castellon stated: "On 11/16/23 I left the dorm at 9:48 am so I was in the package room around 9:50 am submitting my notice of appeal to the Dist[.] Court Northern and the 6th [C]ir[.] (please attach this to the grievance as there is no option for me to reply). Honestly I don't trust you[;] I need any conversation on this subject recorded (the last time I was in administration for a 'meeting' I was falsely accused sent to the hold for 18-days and transferred here). All I need is confirmation that the parce[ls] were sent the 16th so I can cure the untimely filing. Thank you."

- In kite No. 403160021, Castellon stated: "The responder of the grievance asked me for the time that I submitted the parcels to the package room[;] however, the system is not giving me an option to reply so I kited you with the time 9:50am[-]ish. I asked you to attach the kites to the grievance; you have not. You have access to the original cash slip yet you keep telling me to bring the slips in. It is illogical for me to bring you evidence that you have access to. Your refusal to investigate is frustrating my access to the court. Please attach this to the grievance."

Each of the four kites was closed by Rose.

36

**{¶ 109}** Rose avers that he did not understand the kites Castellon sent on December 6 and 7. But Rose knows that those kites had nothing to do with Castellon's November 27 public-records request. A plain reading of the kites sent on December 6 and 7 shows that Castellon was not referring to his public-records request but, rather, to the grievance he had filed. Therefore, when Rose closed these kites, he knew they concerned the grievance with identification No. RiCI000000001482.

**{¶ 110}** *Third*, Rose denied that Castellon came to his office on November 30 to discuss his public-records request even though Castellon obtained an inmate pass dated November 30 at 8:00 a.m. granting him permission to go to the inspector's office. As explained below, contrary to the majority's finding that "there is little evidence in the record to resolve th[e] factual dispute," majority opinion at ¶ __ [page 7, line 12], as to whether Castellon met with Rose in his office on November 30, the inmate pass—in conjunction with the November 30 kite and an unexecuted cash slip—proves that the meeting occurred.

**{¶ 111}** In his November 30 kite, Castellon stated:

> You told me to come to your office to get my grievances and kites[,] after I let you know I am being released very soon and would not have time to get 5 per week. *In your office you said you weren't going to stop what you were doing to print my grievances and that since I was getting out I would have printable access to all my communications. You also said it was posted or sent as a message; I'm having a hard time verifying this all access that you speak of.* I only ask to avoid a public records request. That would be very frustrating.

(Emphasis added.)

**{¶ 112}** Rose did not close this kite by saying something like, "I do not know what you are talking about." Nor did Rose deny that he had met with Castellon in his office or that he had told Castellon that he was not going to stop what he was doing and print Castellon's records. If the two had not met in Rose's office or if Rose had not made that comment, wouldn't he have set the record straight? Instead, Rose reiterated why he had refused to produce Castellon's requested records—because Castellon would have access to all his kites through ViaPath after his release: Rose admitted in his affidavit that by this time, he knew that Castellon was seeking copies of kites. Rose's comment when closing the kite therefore supports Castellon's assertion that he went to Rose's office on November 30 to discuss his public-records request.

**{¶ 113}** And think about this: If Castellon did not go to Rose's office, why would Castellon send the November 30 kite if not to document what Rose had told him in Rose's office? Moreover, Castellon did not ask Rose a question about ViaPath in the Summary section or Details section of that kite, so why did Rose respond by telling him about ViaPath?

**{¶ 114}** *Fourth*, the fact that the cash slip Castellon submitted as evidence is unexecuted is explained by him in his contemporaneous November 30 kite. The reason the cash-slip signature lines are blank is that, as Castellon explained in the kite, Rose denied Castellon's public-records request when he refused to print Castellon's kites.

**{¶ 115}** *Fifth and finally*, Rose's affidavit refutes respondents' argument that Rose was following R.C. 149.43(B)(2) when responding to Castellon's kites. As noted above, Rose does not aver that he ever told Castellon that his public-records request was "ambiguous" or "overly broad" or that the records he was requesting were not "reasonably identif[iable]." To invoke the protections of R.C. 149.43(B)(2), Rose would have had to tell Castellon why the request was being

38

denied and give him the "opportunity to revise the request by informing [him] of the manner in which records are maintained by the [inspector's] office and accessed in the ordinary course of the [inspector's] office's or [Rose]'s duties," R.C. 149.43(B)(2). But Rose did not invoke R.C. 149.43(B)(2) when responding to Castellon's kites.

{¶ 116} For these reasons, respondents cannot rely on R.C. 149.43(B)(2). Based on the explanations that Castellon provided, Rose was actually able to identify the records Castellon was requesting, and he knew where to find them. And because clarification was not necessary, respondents' claim that Rose was giving Castellon an opportunity to revise the request under R.C. 149.43 (B)(2) is disingenuous. Instead, Rose effectively and improperly denied Castellon's November 27 request. Therefore, Castellon is entitled to $1,000 for this violation of the Public Records Act.

## 2. ODRC failed to timely respond to the January 2024 public-records requests

{¶ 117} The majority concludes that a three-week delay in responding to Castellon's January 2024 public-records requests was reasonable because he failed to reasonably identify the records he was seeking. I disagree.

{¶ 118} Castellon made separate and distinct public-records requests, and each request should be viewed independently of the others. Castellon's kite No. 399301011 was sent to Rose on November 27, 2023. In that kite, Castellon requested copies of his communications bearing the following numbers: 384352051, 393175581, 380903401, 397229081, 378403741, 378186531, 340610831, 329089501, 317910161, 317846711, 398219281, 277622421, 274687951, 334902351, 334876341, 398229621, 398109281, 398219281, 3979247741, 397229081, and 393175581.

{¶ 119} But the public-records request Castellon emailed to ODRC on January 17, 2024, includes some numbers of communications not previously

requested. In that email, Castellon requested "public records/grievances." He then listed the following numbers: 384352051, 393175581, 380903401, 397229081, 378403741, 378186531, 340610831, 329089501, 317910161, 317846711, 398219281, 277622421, 274687951, 398109281, 398219281, 398229621, 334902351, 334876341, 334876511, RiCI000000001482, 332458031, 397247741, 397229081, 393175581, 334702531, 334570181, 334287491, and 334028461. Castellon concluded this request by stating, "There are a few kites and grievances from November 2024 through December in which I do not have communication #[;] however, I need them as well."

{¶ 120} These are therefore separate requests.

{¶ 121} As noted above, Castellon's January 17 public-records request was transmitted to drc.publicinfo@odrc.state.oh.us. There was no response to the request from drc.publicinfo@odrc.state.oh.us, so Castellon tried again by emailing Constituent Affairs on January 30.

{¶ 122} The first response from Constituent Affairs, which expressed thanks for the "inquiry, question, or concern," seems to be an automated response. The second response, however, seems to be from an unidentified employee of Constituent Affairs, because he or she stated: "I have contacted the legal department that handles *public information requests*. They should assist you further." (Emphasis added.) After that, crickets.

{¶ 123} The majority fails to contemplate first steps. The majority's analysis jumps straight to ODRC's production of the requested records and concludes that the production was timely. But that is not consistent with the requirements of the Public Records Act. As explained below, the act requires the public office or person responsible for the requested public records to first provide the requester with a response.

{¶ 124} Although it is true that "R.C. 149.43(B) does not set forth a deadline by which a public office must respond to a request for copies of public

records," *Cincinnati Enquirer*, 2016-Ohio-8195, at ¶ 23, the act nevertheless contemplates *some* response. When a public office or the person responsible for public records receives a public-records request, there are three options: "promptly" prepare and make available "all public records responsive to the request," R.C. 149.43(B)(1), deny the request and inform the requester, in writing, of the reasons for the denial, R.C. 149.43(B)(3), or if the request is "ambiguous or overly broad" or the request does not "reasonably identify what public records are being requested," ask the requester to clarify the request, R.C. 149.43(B)(2). If the public office or person responsible for the record denies the request, the statute places the onus on the public office or official to give the requester an opportunity to revise the public-records request after telling the requester how the records are maintained and accessed. *Id.*

{¶ 125} Importantly, respondents do not deny that Castellon transmitted two valid public-records request by email in January 2024, one to drc.publicinfo@odrc.state.oh.us and one to Constituent Affairs. Nor do respondents deny that the email addresses are valid.

{¶ 126} ODRC's public-information office did not respond to Castellon's January 17 public-records request. And someone at Constituent Affairs initially responded to Castellon's January 30 request by asserting that ODRC's legal department handles public-records requests and that he or she had "contacted the legal department."

{¶ 127} But ODRC's legal department did not respond to Castellon's final public-records request. ODRC did not tell him that its response to the request was being prepared, that the request was being denied and the reasons for the denial, or that the request was "ambiguous" or "overly broad" or that the requested records were not reasonably identifiable. There was no communication whatsoever.

{¶ 128} And the unidentified employee responding to that request who stated that it was being sent to the legal department did not provide Castellon with

any information by which to contact the legal department. So, nine days later, with nowhere else to go, Castellon requested relief from this court by filing a complaint for a writ of mandamus to secure copies of public records—his prior communications with ODRC staff—some of which he had been trying to obtain, for legal purposes, since November 2023.

{¶ 129} As this court said in *State ex rel. Cordell v. Paden*, 2019-Ohio-1216, ¶ 11, "[t]he primary duty of a public office when it has received a public-records request is to promptly provide any responsive records within a reasonable amount of time and when a records request is denied, to inform the requester of that denial and provide the reasons for that denial." And the determination whether a public office or person responsible for public records has complied with the statutory duties of the act "depends upon all of the pertinent facts and circumstances." *State ex rel. Morgan v. Strickland*, 2009-Ohio-1901, ¶ 10.

{¶ 130} Here, there was no communication sent by anyone in the legal department to Castellon. Zero, zip, zilch, nada.

{¶ 131} Respondents contend that they denied Castellon's public-records requests because the records were not reasonably identifiable under R.C. 149.43(B)(2), but ODRC did not provide Castellon with any notice of the denial of his January 2024 requests, and ODRC's office of public information and its legal department do not explain why they did not give the required notice of denial to Castellon. Without that explanation, I must conclude that ODRC violated R.C. 149.43(B)(2).

{¶ 132} Finally, producing the requested records in April 2024, months after they were requested, is plainly unreasonable. In fact, we have suggested that "31 business days may appear to stretch the outer limits of reasonableness" in fulfilling public-records requests when there was not a large frequency or volume of requests and redactions were not needed. *See State ex rel. Shaughnessy v. Cleveland*, 2016-Ohio-8447, ¶ 22. There was not a large frequency or volume of

requests and redactions were not needed here. Castellon is therefore entitled to $2,000 in statutory damages for the January requests.

{¶ 133} To summarize: because, in my view, Castellon transmitted three public-records requests reasonably identifying the records he was seeking to a public office or a person responsible for the requested records, because Castellon's November 27, 2023 request initially was improperly denied, and because respondents failed to respond to the January 2024 requests within a "reasonable period of time," R.C. 149.43(B)(1), Castellon is entitled to an award of $3,000 in statutory damages.

### 3. Other Violations of the Public Records Act

{¶ 134} But even if one disagrees with the above analysis, respondents violated the Public Records Act in two other ways as well. Even the majority should recognize that Castellon is entitled to statutory damages for these violations.

{¶ 135} First, Rose violated another provision of the Public Records Act when he limited Castellon to five records a week. He closed the November 27 kite by telling Castellon that he could obtain only a "(Maximum of 5 [copies] per week)" and that it would "take approximately 14 days" to produce copies of those records.

{¶ 136} That response set off a series of kite communications between Castellon and Rose. Castellon's next kite to Rose shows that Castellon was concerned that Rose's "maximum" limitation per week and the amount of time to produce the records—14 days—would not allow him to obtain all his "communications" for legal purposes prior to his release.

{¶ 137} Time was of the essence for Castellon, because he would be released from prison by December 18, 2023 (if not sooner should his time in prison be recalculated as he requested). So, Rose's edict that he would produce no more than five documents a week and that he would need 14 days to produce them ensured that Castellon would not receive copies of all his kites prior to his release.

But Rose's "Maximum 5 per week" limitation is itself a categorical violation of the Public Records Act under R.C. 149.43(B)(1).

{¶ 138} R.C. 149.43(B)(1) provides that "[u]pon request by *any person* * * * , *all public records responsive to the request shall be promptly prepared* and made available for inspection to the requester at all reasonable times during regular business hours." (Emphasis added.) Obviously, Rose's limitation on how many kites he would produce for an incarcerated person violates the express provisions of the act.

{¶ 139} What if the person requesting the records from Rose were not an incarcerated person but the Cincinnati Enquirer or the Columbus Dispatch? Does anyone believe that Rose would tell them that he would produce no more than five records a week? Hardly.

{¶ 140} A second violation is apparent from Rose's averment that he works to provide paper copies of documents "requested in good faith." Nowhere does the Public Records Act provide a public office or a person responsible for public records with authority to deny a public-records request based on the subjective belief that it was not made in good faith. R.C. 149.43(B)(4) prohibits requiring a public-records requester to reveal the intended use of the information contained in a public record; "public offices are obligated to honor public-record requests regardless of the requester's reasons for or objectives in requesting the records," *Rhodes v. New Philadelphia*, 2011-Ohio-3279, ¶ 21. In any case, Castellon said he needed the records for legal purposes; what those legal purposes were is of no consequence to Rose.

{¶ 141} In addition to the improper denial of Castellon's November 27, 2023 public-records request, Rose also violated the Public Records Act in these two ways as well. There can be no doubt that respondents violated a duty imposed by R.C. 149.43(B), so Castellon is undisputedly entitled to at least $1,000 in statutory

44

damages, even if Rose's denial of the November request were proper and the time taken to respond to Castellon's January 2024 requests were reasonable.

### C. Statutory Damages Are Fixed by Statute and May Not Be Reduced

{¶ 142} Respondents argue that any statutory damages this court awards should be limited based on the number of days that passed between the filing of the mandamus action and this court's sua sponte ordering mediation. I disagree. Statutory damages are fixed by statute.

{¶ 143} Although the Public Records Act contemplates court intervention, it does not control what type of intervention a court must employ to resolve a public-records dispute.

{¶ 144} R.C. 149.43(C)(1)(b) provides that if a person is "allegedly aggrieved by the failure of a public office or the person responsible for public records to promptly prepare a public record . . . in accordance with [R.C. 149.43(B)] or by any other failure of a public office or the person responsible for public records to comply with an obligation," the aggrieved person may commence a mandamus action. If a requester transmits an electronic submission "in a manner that fairly describes the public record," the requester is entitled to recover statutory damages "at one hundred dollars for each business day during which the public office or person responsible for the requested public records failed to comply with an obligation in accordance with [R.C. 149.43(B)], beginning with the day on which the requester files a mandamus action to recover statutory damages, up to a maximum of one thousand dollars." R.C. 149.43(C)(2).

{¶ 145} The Public Records Act requires a court to make two findings before it "may reduce an award of statutory damages or not award statutory damages." R.C. 149.43(C)(2). The first required finding is that "based on the ordinary application of statutory law and case law as it existed at the time of the conduct . . . , a well-informed public office or person responsible for the requested public records reasonably would believe that the conduct . . . did not constitute a

failure to comply with an obligation in accordance with" R.C. 149.43(B). R.C. 149.43(C)(2)(a). The second required finding is "[t]hat a well-informed public office or person responsible for the requested public records reasonably would believe that the conduct . . . would serve the public policy that underlies the authority that is asserted as permitting that conduct." R.C. 149.43(C)(2)(b).

{¶ 146} Because neither finding can be made in this case, Castellon's request for statutory damages may not be denied nor may any less than $3,000 be awarded.

## III. CONCLUSION

{¶ 147} The real heartburn in this case comes from realizing why it is in this court today. All of this could have been avoided. Think of all the resources taxpayers could have saved if Rose would have just printed copies of Castellon's kites on November 30, 2023, before Castellon was released from prison. Problem solved. Crisis averted.

{¶ 148} As explained above, Castellon has proved by clear and convincing evidence that respondents improperly denied one public-records request when he transmitted it to a public office or the person responsible for public records and that ODRC failed to timely respond to two other such requests Castellon sent. Therefore, I would hold that respondents violated their duties under R.C. 149.43(B) and that Castellon is entitled to $3,000 in statutory damages. The findings required before we may reduce or deny an award of statutory damages cannot be made in this case, so I would award Castellon that amount. Because the majority does otherwise, I concur in part and dissent in part.

_____

Estephen Castellon, pro se.

Dave Yost, Attorney General, and Adam Beckler, Assistant Attorney General, for respondents.

_____