[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Howard v. Chief Inspector's Office*, Slip Opinion No. 2026-Ohio-1428.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-1428

THE STATE EX REL. HOWARD *v.* CHIEF INSPECTOR'S OFFICE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Howard v. Chief Inspector's Office*, Slip Opinion No. 2026-Ohio-1428.]

Mandamus—Public-records requests—R.C. 149.43—A public office has a clear legal duty to produce public records only when it has fair notice that it has received a public-records request; the requester has the burden to show that he clearly submitted a public-records request—Whether a request is a public-records request may depend on the context in which the request was made—Request for records made in an inmate's grievance appeal under Adm.Code 5120-9-31 was not clearly a public-records request—Public office permitted to argue for first time in litigation that inmate did not clearly make a public-records request—Writ and requests for statutory damages and court costs denied.

(No. 2024-1542—Submitted May 13, 2025—Decided April 23, 2026.)

IN MANDAMUS.

_____

The per curiam opinion below was joined by FISCHER, DEWINE, DETERS, HAWKINS, and SHANAHAN, JJ. KENNEDY, C.J., concurred in part and dissented in part, with an opinion joined by BRUNNER, J.

**Per Curiam.**

{¶ 1} Relator, Devin D. Howard, filed a public-records mandamus action against respondent, the Ohio Department of Rehabilitation and Correction's ("ODRC") chief inspector's office ("inspector's office").[1] Howard asserts in his mandamus complaint that he included a public-records request in an appeal he filed with the inspector's office related to the disposition of an inmate grievance and that his public-records request went unanswered. The inspector's office asserts that it did not interpret Howard's grievance appeal as containing a public-records request and, therefore, did not respond to it.

{¶ 2} Howard seeks a writ of mandamus compelling the inspector's office to provide him with the work-schedule assignments of two correction officers and copies of two ODRC policies. In addition, Howard requests statutory damages and court costs. For the following reasons, we deny the writ and the requests for statutory damages and court costs. We also deny as moot Howard's motion to strike portions of two affidavits submitted as evidence by the inspector's office.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 3} Howard, an inmate at Lake Erie Correctional Institution ("LECI"), alleges that a correction officer damaged his personal property. Howard filed an informal complaint about the incident, which eventually escalated to a notification

_____

1. The inspector's office was created by ODRC in accordance with Adm.Code 5120-9-30, as authorized by R.C. 5120.06. Among the duties of the inspector's office is the administration of the inmate-grievance procedure, which is set forth in Adm.Code 5120-9-31. *See* Adm.Code 5120-9-30(C).

of grievance. Grievances of this kind are handled by the correctional institution's institutional inspector. Adm.Code 5120-9-29(A). Howard's institutional inspector denied his grievance, finding that Howard "ha[d] not provided any information or evidence to support [his] claim."

{¶ 4} Dissatisfied, Howard appealed to the inspector's office of ODRC. Howard complained in his appeal that the institutional inspector "ha[d] not described the steps that were taken to investigate" his grievance, as required by Adm.Code 5120-9-31(J)(2). *See* Adm.Code 5120-9-31(J)(2) ("The [inspector's] written response shall summarize the inmate's complaint [and] describe what steps were taken to investigate the complaint and the inspector['s] findings and decision."). He voiced concern that the inspector had not interviewed anyone about the claimed property damage. He ended his written appeal with "I request the work schedule assignment[s] of [two named correction officers] from May 23, 2023 to June 17, 2023. I also request a copy of ODRC Policy 09-INV-01 and 61-PRP-01."

{¶ 5} The inspector's office instructed the institutional inspector to review Howard's complaint and author a supplemental disposition of Howard's grievance. The institutional inspector complied and wrote to Howard that he had conducted interviews and reviewed security footage to conclude that there was insufficient evidence to show that a correction officer had damaged Howard's property.

{¶ 6} That was the end of Howard's administrative proceedings but the beginning of this case. Howard filed this mandamus action on November 4, 2024, and attached to his complaint the grievance form that he alleges contains his public-records request for the work-schedule assignments and the ODRC policies. The inspector's office acknowledges that the attachment is an accurate copy of Howard's grievance but contests that it contains a public-records request. Howard asserts that because the inspector's office did not respond to his public-records request within a reasonable period, he is entitled to a writ ordering the inspector's

office to produce the requested records, $1,000 in statutory damages, and court costs.

{¶ 7} The inspector's office filed an answer, and we issued an alternative writ setting the schedule for the submission of evidence and the filing of briefs, 2025-Ohio-156. Both Howard and the inspector's office filed merit briefs and evidence. Howard did not file a reply brief. He did, however, file a motion to strike parts of the two affidavits submitted as evidence by the inspector's office, and the inspector's office filed a response to Howard's motion.

{¶ 8} The inspector's office submitted two affidavits as evidence. The first affidavit is from Uriah Melton, an assistant chief inspector, and the second affidavit is from Rachel Smith, an LECI employee. Both Melton and Smith attest that their affidavits are based on personal knowledge and that ODRC policies are available in LECI's library.

{¶ 9} Smith also attests in her affidavit that physical copies of ODRC Policy Nos. 09-INV-01 and 61-PRP-01 were provided to Howard after he filed his mandamus action. The evidence submitted by the inspector's office includes a signed receipt acknowledging that both ODRC policies were given to Howard, and Smith attests that the signature on the receipt is Howard's.

{¶ 10} Melton attests that in his assistant-chief-inspector role, he reviews grievance appeals in accordance with Adm.Code 5120-9-31. He further attests that he did not interpret Howard's request for the two ODRC policies and the work-schedule assignments of the two correction officers as a public-records request, because the grievance-appeal procedure does not include the production of documents or records related to the inmate's grievance. Additionally, Melton attests that (1) the work-schedule assignments of correction officers are confidential, (2) disclosing the assignments would place the security of the staff and other inmates in jeopardy, and (3) the assignments could be used by an

4

incarcerated person to learn staff patterns and formulate an escape plan or otherwise manipulate or extort correction officers.

{¶ 11} Howard submitted his own affidavit. He attests that he electronically submitted a public-records request within his grievance appeal to the inspector's office. He further attests that he does not have access to the websites through which the two ODRC policies are available and that the policies are not available "in tangible form" at LECI.

## II. ANALYSIS

### A. Howard did not clearly make a public-records request

{¶ 12} Ohio's Public Records Act, R.C. 149.43, "requires a public office to make copies of public records available to any person upon request within a reasonable period of time." *State ex rel. Ware v. Akron*, 2021-Ohio-624, ¶ 11; *see also* R.C. 149.43(B)(1). A writ of mandamus is an appropriate remedy to compel a public office to comply with the Public Records Act. *State ex rel. Adkins v. Cole*, 2025-Ohio-1026, ¶ 6; R.C. 149.43(C)(1). To obtain the writ, Howard must prove by clear and convincing evidence a clear legal right to the requested records and a corresponding clear legal duty on the part of the inspector's office to provide them. *Adkins* at ¶ 6. Thus, to meet his burden for mandamus relief, Howard must show that he clearly submitted a public-records request. *See State ex rel. Griffin v. Doe*, 2021-Ohio-3626, ¶ 6 ("To meet his burden of proof, [the requester] must show that he requested a public record pursuant to R.C. 149.43(B)(1) and that the [public office] did not make the record available in response to that request."). For the reasons explained below, we conclude that Howard has failed to clearly show that he submitted a public-records request to the inspector's office.

{¶ 13} The Public Records Act does not "'requir[e] that a requester formally label a public-records request as a "formal public records request," *see* R.C. 149.43(B), and a requester is generally not required to cite a particular rule or statute when making a request.'" *State ex rel. Berry v. Booth*, 2024-Ohio-5774,

¶ 9, quoting *State ex rel. Ware v. Dept. of Rehab. & Corr.*, 2024-Ohio-1015, ¶ 16 (lead opinion).  But a public-records requester must "'identify with reasonable clarity the records at issue.'"  *State ex rel. Morgan v. New Lexington*, 2006-Ohio-6365, ¶ 29, quoting *State ex rel. Fant v. Tober*, 1993 WL 173743, *1 (8th Dist. Apr. 28, 1993).  Moreover, "'it must be clear that the requester is requesting a public record.'"  *Berry* at ¶ 9, quoting *State ex rel. Teagarden v. Igwe*, 2024-Ohio-5772, ¶ 20.

{¶ 14} This clarity requirement is a necessary component of the standard for mandamus relief.  To obtain a writ of mandamus, a relator must establish by clear and convincing evidence that the respondent violated a "'clear legal duty,'" *Adkins* at ¶ 6, quoting *State ex rel. Griffin v. Sehlmeyer*, 2021-Ohio-1419, ¶ 10; *see also State ex rel. Fed. Homes Properties, Inc. v. Singer*, 9 Ohio St.2d 95, 96 (1967).  In the context of a public-records mandamus case, a clear legal duty can arise only when a respondent has fair notice that it has received a public-records request.

{¶ 15} How one understands a request will often depend on the context in which the request is made.  Saying "hit me" at a blackjack table has a very different meaning than saying "hit me" during a heated argument.  One reason it is important for a requester to give fair notice to a public office that he is making a public-records request is because other information-gathering regimes exist.  For example, outside of the Public Records Act, there are the discovery procedures that apply to civil and criminal litigation.  *See* Civ.R. 26 through 37; Crim.R. 16.  Despite both being means for private persons to gain information, the Public Records Act is distinct from discovery.  *See State v. Athon*, 2013-Ohio-1956, paragraph one of the syllabus (stating that the Public Records Act is an independent basis for obtaining information that "does not supersede the requirements of criminal discovery"); *Stonehill v. Internal Revenue Serv.*, 558 F.3d 534, 538 (D.C.Cir. 2009) ("The [Freedom of Information Act's] disclosure regime . . . is distinct from civil discovery."); *Am. Bank v. Menasha*, 627 F.3d 261, 265 (7th Cir. 2010) ("The case

law uniformly refuses to define requests . . . under public records laws . . . as discovery demands . . . .").

{¶ 16} When a relator is operating in the context of another procedure with its own set of rules, it will often be reasonable for the recipient of the request to assume that a requester is asking for documents under those rules. A government attorney, for example, who receives a request for document production in the context of a civil case will naturally assume that the Rules of Civil Procedure govern the request.

{¶ 17} Contrary to the literalist view of the opinion concurring in part and dissenting in part, "[i]n textual interpretation, context is everything," Scalia, *A Matter of Interpretation: Federal Courts and the Law*, 37 (1997). The opinion concurring in part and dissenting in part would have us "not look beyond the four corners" of Howard's public-records request. Opinion concurring in part and dissenting in part, ¶ 108. But "modern textualists reject the idea that interpretation can occur 'within the four corners' of a statute." John F. Manning, *The Absurdity Doctrine*, 116 Harv.L.Rev. 2387, 2456 (2003), quoting *White v. United States*, 191 U.S. 545, 551 (1903). "After all, the meaning of a word depends on the circumstances in which it is used. . . . To strip a word from its context is to strip that word of its meaning." *Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring).

{¶ 18} So, whether a relator has clearly shown that he made a public-records request may depend on the context in which the request was made. It is the relator's burden to show that the public office should have reasonably interpreted his request as a request under the Public Records Act. Therefore, because Howard admittedly made his request as part of his grievance appeal, the context of the grievance appeal is pertinent.

{¶ 19} A grievance appeal is the final step in a three-step procedure for administratively resolving "inmate complaints related to any aspect of institutional

life that directly and personally affects the grievant." Adm.Code 5120-9-31(A) and (J). This includes a complaint that ODRC damaged the personal property of an inmate. Adm.Code 5120-9-32(A).

{¶ 20} The grievance procedure begins with the inmate filing an informal complaint that contains specific information about the event that gave rise to the complaint. Adm.Code 5120-9-31(J). If the inmate is dissatisfied with the response to his complaint, he may file a notification of grievance with the institutional inspector. Adm.Code 5120-9-31(J)(2). The institutional inspector's response must "summarize the inmate's complaint [and] describe what steps were taken to investigate the complaint and the inspector['s] findings and decision." *Id.* If the inmate is still dissatisfied with the institution's response, he can file a grievance appeal with the inspector's office. Adm.Code 5120-9-31(J)(3). The grievance appeal must "contain a clear, concise statement explaining the basis for the appeal" and is limited to the issues presented in the informal complaint or notification of grievance. *Id.*

{¶ 21} Here, the institutional inspector's response to Howard's notification of grievance was that Howard "ha[d] not provided any information or evidence to support [his] claim," so he denied Howard's grievance. As the basis for his appeal, Howard wrote that the institutional inspector failed to comply with Adm.Code 5120-9-31(J)(2) by omitting from his response what steps were taken to investigate Howard's complaint. Howard ended his appeal by requesting the work-schedule assignments of two correction officers that he said observed the damage to his property. Howard also asked for copies of ODRC Policy Nos. 09-INV-01 and 61-PRP-01. Howard asserts that his request for these documents constitutes a public-records request.

{¶ 22} While what Howard requested—work-schedule assignments and copies of ODRC policies—might constitute public records if he made a public-records request, he made his request as part of his grievance appeal. As laid out

8

above, grievance appeals are limited in scope. There are no discovery provisions in the inmate-grievance procedure, and the inspector's office does not produce documents for the aggrieved inmate as part of the grievance-appeal procedure. Moreover, only issues raised in an informal complaint or notification of grievance may be raised in a grievance appeal. Adm.Code 5120-9-31(J)(3). And the inspector's office's sole responsibility in handling grievance appeals is to render a disposition on the claimed basis for appeal. *See* Adm.Code 5120-9-30(C)(2). The inspector's office fulfilled its duty by ordering the institutional inspector to issue a supplemental disposition that would comply with Adm.Code 5120-9-31(J)(2).

{¶ 23} The opinion concurring in part and dissenting in part derides us for "set[ting] aside" the party-presentation principle in finding Howard's request to not be a public-records request. Opinion concurring in part and dissenting in part at ¶ 60. Specifically, it argues that a records custodian may not assert "for the first time in litigation that a public-records request [is] ambiguous." *Id.* at ¶ 53. Under the plain terms of the Public Records Act, a public-records custodian is not "preclude[d] . . . from relying upon additional reasons or legal authority," in addition to the reasons or legal authority provided to the requester when the public-records request was denied, in defending a mandamus action, R.C. 149.43(B)(3); *see also State ex rel. Ware v. Smith*, 2025-Ohio-1856, ¶ 16. Despite this clear statutory directive, our caselaw has recognized a limited exception to this rule that bars a public-records custodian from raising an overbreadth argument for the first time in litigation because it would deny the requester "'an opportunity to revise the request by informing the requester of the manner in which records are maintained by the public office and accessed in the ordinary course'" and thus deny the requester "the opportunity to cure" his deficient request, *State ex rel. Summers v. Fox*, 2020-Ohio-5585, ¶ 74, quoting R.C. 149.43(B)(2). But this exception applies only to arguments about overbreadth. *See id.* (only discussing overbreadth); *accord State ex rel. Ames v. Big Walnut Local School Dist. Bd. of Edn.*, 2026-Ohio-532,

¶ 19, fn. 1 ("[A] public office may not assert for the first time in litigation that a public-records request was overbroad."). Here, the inspector's office is not arguing that Howard's request was overly broad. Rather, it is arguing that it was not clear that Howard was making a public-records request at all. Contrary to the assertion by the opinion concurring in part and dissenting in part, we have never held that such an argument may not be presented for the first time in litigation.

{¶ 24} Howard's request was embedded in his grievance appeal and came after his description of his basis for appeal. In this context, Melton's belief that the request for the work-schedule assignments and policies was a discovery-like request as part of the grievance-appeal procedure, and not a request under the Public Records Act, is reasonable. Howard has thus failed to meet his burden to establish that it was "'clear that [he was] requesting a public record,'" *Berry*, 2024-Ohio-5774, at ¶ 9, quoting *Teagarden*, 2024-Ohio-5772, at ¶ 20. Therefore, we deny his request for a writ of mandamus.

### B. Howard's motion to strike is moot

{¶ 25} Howard filed a motion to strike parts of the two affidavits submitted as evidence by the inspector's office. Howard specifically asks that we strike the parts of Melton's and Smith's affidavits in which they attest that ODRC's policies are in LECI's library and available for review by inmates. Howard argues that neither Melton nor Smith "mention foundational facts which suggest that either of them has personal knowledge" that ODRC's policies are available in the library for inmates to review.

{¶ 26} The assertions made in the affidavits might matter if this court had decided that Howard made a public-records request. But because we have decided that Howard did not make a public-records request, these assertions are irrelevant to our determination that Howard is not entitled to mandamus relief. Therefore, we deny Howard's motion to strike as moot.

10

**C.  Howard is not entitled to statutory damages**

{¶ 27} "A public-records requester may obtain statutory damages 'if a court determines that the public office or the person responsible for public records failed to comply with an obligation' under R.C. 149.43(B)."[2]  *State ex rel. Mobley v. Viehweger*, 2024-Ohio-4748, ¶ 11.  Because Howard has failed to clearly show that he made a public-records request, he has not shown that the inspector's office failed to comply with an obligation under the Public Records Act.  Therefore, we deny Howard's request for statutory damages.

**D.  Howard is not entitled to court costs**

{¶ 28} Howard also requests court costs.  Since Howard filed an affidavit of indigency, there are no court costs to award.  *See State ex rel. Woods v. Lawrence Cty. Sheriff's Office*, 2023-Ohio-1241, ¶ 12.  Accordingly, we deny Howard's request for court costs.

**III.  CONCLUSION**

{¶ 29} For the foregoing reasons, we deny Howard's request for a writ of mandamus compelling the inspector's office to produce copies of the work-schedule assignments of two correction officers and ODRC Policy Nos. 09-INV-01 and 61-PRP-01.  We also deny Howard's requests for statutory damages and court costs.  And we deny Howard's motion to strike as moot.

Writ denied.

————————————

**KENNEDY, C.J., joined by BRUNNER, J., concurring in part and dissenting in part.**

{¶ 30} I agree with the majority that relator, Devin D. Howard, is not entitled to an award of court costs in this original action.  I part ways with the

———

2. The General Assembly has recently amended R.C. 149.43, most notably in 2024 Sub.H.B. No. 265 (effective Apr. 9, 2025), and some provisions have been renumbered.  This opinion applies the version of the statute enacted in 2023 Am.Sub.H.B. No. 33 (effective Oct. 3, 2023).

majority, however, in its conclusion that Howard is not entitled to a writ of mandamus compelling the production of the public records that Howard requested. Contrary to the majority's assertion, Howard did in fact make a public-records request when he asked for copies of two correction officers' past work-schedule assignments and for copies of two Ohio Department of Rehabilitation and Correction ("ODRC") policies in a grievance form that he filled out.

{¶ 31} Respondent, ODRC's chief inspector's office, failed to comply with its statutory obligation to promptly and appropriately respond to Howard's public-records request. After Howard filed his complaint for a writ of mandamus, an employee at the correctional institution where Howard is incarcerated provided him with copies of the two requested ODRC policies. Therefore, the only outstanding portion of Howard's public-records request is his request for two correction officers' work-schedule assignments from 2023.

{¶ 32} Because this court's caselaw prohibits a party from raising in the first instance during litigation that a public-records request is ambiguous or overly broad, and because the chief inspector's office failed to meet its burden to prove that the correction officers' work-schedule assignments from 2023 are exempt from disclosure as security records as that term is defined in R.C. 149.433(A)(1), I would grant a writ of mandamus ordering the chief inspector's office to either provide Howard with copies of the work-schedule assignments of the two correction officers from May 23 through June 17, 2023, or certify to this court that the records no longer exist. Additionally, because the chief inspector's office violated R.C. 149.43(B)[3] by failing to timely and appropriately respond to Howard's public-records request, I would award Howard statutory damages in the amount of $1,000.

---

3. The General Assembly has recently made amendments to R.C. 149.43, most notably in 2024 Sub.H.B. No. 265 (effective Apr. 9, 2025), and some provisions have been renumbered. This opinion applies the version of the statute enacted in 2023 Am.Sub.H.B. No. 33 (effective Oct. 3, 2023).

{¶ 33} Consequently, I concur in part and dissent in part.

## I. ANALYSIS

{¶ 34} This case is about whether a request for records in a grievance form constitutes a public-records request. ODRC's grievance form is a secure method for incarcerated persons to communicate with institution staff as part of the inmate-grievance procedure, which may include informal complaints, grievances, grievance appeals, and other correspondence to staff. *See* Adm.Code 5120-9-31(D); *see also* Adm.Code 5120-9-31(J). The form "is similar in appearance and structure to a kite." *State ex rel. Castellon v. Rose*, 2025-Ohio-1491, ¶ 45 (Kennedy, C.J., concurring in part and dissenting in part).

{¶ 35} The chief inspector's office makes four arguments in its merit brief. First, the chief inspector's office contends that Howard is not entitled to an award of statutory damages because his public-records request was "ambiguous, does not fairly describe the public record, or is a request for information." Second, the chief inspector's office maintains that Howard's request for a writ of mandamus is moot because he has now received the records he sought. Third, the chief inspector's office claims that it has no duty to produce the 2023 work-schedule assignments of the two correction officers because those records are exempt from disclosure as security records under R.C. 143.433(B)(1). Lastly, the chief inspector's office argues that even if Howard is entitled to an award of statutory damages, this court should reduce or decline to award statutory damages under R.C. 149.43(C)(2) because the chief inspector's office believed that it complied with the law as it existed at the time of Howard's request and that its actions served the public policy underlying the Public Records Act by interpreting the request as one for information under the inmate-grievance procedure.

{¶ 36} For ease of discussion, I address the chief inspector's office's arguments out of order.

### A. Howard's Request for Two Work-Schedule Assignments Is Not Moot

{¶ 37} I agree with the chief inspector's office's statement of the law in its second proposition of law but not its application of the law to this case. An action for a writ of mandamus is moot when a public office or person responsible for public records ("records custodian") produces the records sought. *See State ex rel. Martin v. Greene*, 2019-Ohio-1827, ¶ 7, citing *State ex rel. Toledo Blade Co. v. Seneca Cty. Bd. of Commrs.*, 2008-Ohio-6253, ¶ 43 (when a public office provides a requestor with the public records sought, the requestor's public-records mandamus case becomes moot). Here, however, Howard sought more than just the two ODRC policies that have been provided to him; he also requested work-schedule assignments from 2023 for two correction officers. This case therefore is not moot regarding the request for the work-schedule assignments, and for that reason, the chief inspector's office's second proposition of law is not well-taken.

### B. The Chief Inspector's Office Did Not Establish That the Work-Schedule Assignments Are Security Records

{¶ 38} Regarding the chief inspector's office's third proposition of law—that it is under no obligation to produce security records that are exempt from disclosure—it has failed to meet its burden to prove that the work-schedule assignments of two correction officers from almost three years ago are exempt from disclosure under that statutory provision.

{¶ 39} "If a [records custodian] withholds a record on the basis of a statutory exception, the 'burden of production' is on the . . . records custodian to plead and prove facts clearly establishing the applicability of the exemption." *Welsh-Huggins v. Jefferson Cty. Prosecutor's Office*, 2020-Ohio-5371, ¶ 27. "Security records" are records that "contain[] information directly used for protecting or maintaining the security of a public office against attack, interference, or sabotage." R.C. 149.433(A)(1). To qualify as a security record under that definition, the record in question must "contain information *directly used* to protect

14

and maintain the security of the public office from attack, interference, or sabotage." (Emphasis in original.) *Welsh-Huggins* at ¶ 82 (Kennedy, J., concurring in judgment only). Therefore, under R.C. 149.433(A)(1), "a record's status as a security record is determined by the public office's actual use of the information." *Id.* at ¶ 69.

{¶ 40} The records custodian bears the burden of establishing that a record is exempt from disclosure under Ohio's Public Records Act, R.C. 149.43. *State ex rel. Rogers v. Dept. of Rehab. & Corr.*, 2018-Ohio-5111, ¶ 7, 14. "And when a [records custodian] claims an exception based on risks that are not apparent within the records themselves, the [records custodian] must provide more than conclusory statements in affidavits to support its claim." *Id.* at ¶ 15.

{¶ 41} This court concluded that the records custodian met that burden in *State ex rel. Cincinnati Enquirer v. Wilson*, 2024-Ohio-182. In *Wilson*, the Cincinnati Enquirer requested travel records for state troopers who were providing security for Governor Mike DeWine to attend the Super Bowl. The evidence "show[ed] that the [Ohio Department of Public Safety] use[d] information in the [travel] records to plan for the governor's security on a day-to-day and event-to-event basis." *Id.* at ¶ 29.

{¶ 42} I concurred in this court's judgment in *Wilson* but authored a separate opinion clarifying that the affidavits submitted to establish the exception showed that the requested records did "contain information identifying the names and number of members of the governor's security personnel; dates, times, and sequencing of the governor's travel; and patterns related to the governor's security detail" and that the affiants "specifically explained . . . that th[e] information [would] be used 'when planning future trips with the Governor' and '[would] inform how the Governor's security personnel allocate[d] resources' for the governor's safety." *Id.* at ¶ 49 (Kennedy, C.J., concurring). Consequently, the

affidavits proved that the security-records exception applied because they showed *how the records were directly used* to maintain the security of a public official.

{¶ 43} In contrast, in *Rogers*, this court concluded that ODRC did not prove that a prison's surveillance-video footage was exempt from disclosure as a security record. 2018-Ohio-5111 at ¶ 21. In reaching its decision, this court held that ODRC did not show how the requested video footage fit "squarely within the exception," *id.*, because ODRC supported its claim solely with conclusory statements, *id.* at ¶ 19. In fact, it did "not offer[] any analysis" explaining why the exception applied. *Id.* at ¶ 21. This court suggested that ODRC could have provided evidence showing that the video footage was "being used in a current investigation regarding the incident depicted in it" or that the video disclosed "current security response plans or other protocols," but it did not do so. *Id.*

{¶ 44} As in *Rogers*, the affidavit submitted as evidence in this case does not explain how the May 23 through June 17, 2023 work-schedule assignments of two correction officers—one of whom is no longer employed by ODRC—contain information that is *directly used* to protect and maintain the security of any public office from attack, interference, or sabotage.

{¶ 45} In the affidavit, Assistant Chief Inspector Uriah Melton makes conclusory statements that disclosing work-schedule assignments that are now almost three years old nonetheless creates a safety risk. According to Melton, "[a]llowing incarcerated persons to know the work schedules of correction officers *could allow them* to know staffing patterns, allowing them to develop escape plans and other methods of manipulation and extortion of correction officers." (Emphasis added).

{¶ 46} The chief inspector's office has failed to establish how old work-schedule assignments meet the definition of a security record because Melton does not state in his affidavit how ODRC directly uses the information in the requested records to protect and maintain the security of a public office from attack,

interference, or sabotage. Melton's averments show only how the information in the records *could* be used to threaten the correctional institution, not how the information *is* used by the institution to protect itself from threats.

{¶ 47} Moreover, Melton talks about the work-schedule assignments in the present tense and in general terms. He does not address how almost three-year-old work-schedule-assignments contain information that is still directly used to protect the institution from attack, interference, or sabotage. And although it may be true that work-schedule assignments could be used for manipulating or extorting correction officers, that does not explain how the information contained in the work-schedule assignments is directly used for protecting and maintaining the security of the correctional institution from attack, interference, or sabotage—especially when one record is for a correction officer who is no longer employed by ODRC. Again, Melton explains how bad actors could use the information in the records but not how the public office directly uses that information.

{¶ 48} The chief inspector's office has the burden to prove that the work-schedule assignments of two correction officers from May 23 through June 17, 2023, "fall[] squarely within the security-record exception codified in R.C. 149.433(B)," *Rogers*, 2018-Ohio-5111, at ¶ 19. However, the chief inspector's office has failed to meet that burden.

{¶ 49} Because the chief inspector's office asserts no other basis for its withholding the work-schedule assignments, Howard is entitled to a writ of mandamus compelling production of the requested records.

### C. Howard Made a Public-Records Request

*1. The Chief Inspector's Office Did Not Properly Raise Its Ambiguity Argument*

{¶ 50} In support of its first proposition of law, the chief inspector's office argues that Howard is not entitled to statutory damages, because his public-records request—though fairly describing the records Howard sought—is ambiguous. According to the chief inspector's office, because Howard "made no effort to

separate his request for records from his appeal or distinguish it as a request made under Ohio's Public Records Act," he caused the chief inspector's office to believe that he was "seeking information." And even though Howard was not required to specifically identify his request as a public-records request, the chief inspector's office argues that a request "becomes ambiguous when it is couched or embedded within another administrative procedure without further distinction." The heart of the chief inspector's office's argument is that it could not distinguish between Howard's grievance appeal and his public-records request, therefore making Howard's request for records ambiguous. But this court's caselaw prohibits the chief inspector's office from raising this argument in the first instance in litigation.

{¶ 51} Although the chief inspector's office conceded in its merit brief that Howard's request was "fairly described," it nonetheless raises for the first time in this mandamus action that the request was ambiguous. I understand that a records custodian is permitted to rely on "additional reasons or legal authority in defending an action" in mandamus, R.C. 149.43(B)(3), but this court has recognized an exception to this rule.

{¶ 52} In *State ex rel. Summers v. Fox*, the records custodian denied a public-records request on the ground that the requester sought privileged material. 2020-Ohio-5585, ¶ 72. After the requester filed a mandamus action, the custodian abandoned that defense and raised for the first time that the request was overly broad under R.C. 149.43(B)(2). This court recognized that a records custodian may deny an overly broad public-records request, *Summers* at ¶ 73, but that if it does, the records custodian must "'provide the requester with an opportunity to revise the request by informing the requester of the manner in which records are maintained by the public office and accessed in the ordinary course of the public office's or person's duties,'" *id.* at ¶ 74, quoting R.C. 149.43(B)(2). This court held that the records custodian could not raise for the first time in litigation the defense that the request was overly broad, because that would allow the custodian to avoid his

statutory duty of providing the requester with an opportunity to revise the request. *Id*.

{¶ 53} The same reasoning applies when a public-records custodian asserts for the first time in litigation that a public-records request was ambiguous. A records custodian is required to provide a public-records requester with an opportunity to revise his request "[i]f [the] requester makes an *ambiguous or overly broad request*." (Emphasis added.) R.C. 149.43(B)(2). *Summers*'s rule that an overbreadth defense may not be raised for the first time in litigation is based on this statutory language, and that rule applies equally to an ambiguity defense.

{¶ 54} The majority nonetheless argues in this case that "we have never held that such an argument [that it was not clear that Howard was making a public-records request] may not be presented for the first time in litigation." Majority opinion, ¶ 23. But the majority never says that *Summers* was wrongly decided. And the majority's argument is disingenuous. While it is true that *Summers* involved an overbreadth defense and not one based on the alleged ambiguity of the request, that is plainly a distinction without a difference. As explained above, the statute requires a records custodian to provide a public-records requester with an opportunity to revise both ambiguous and overly broad requests. *See* R.C. 149.43(B)(2). The same reasoning that this court applied in *Summers* when addressing an overbreadth defense therefore applies equally to a defense asserting that a public-records request is ambiguous—otherwise, a records custodian could deprive the requester of his statutory right to revise his request.

{¶ 55} So if Howard's request was ambiguous—something that is hard to square with the chief inspector's office's admission in its merit brief that Howard "fairly described the records sought"—then the chief inspector's office had a duty under R.C. 149.43(B)(2) to "provide [Howard] with an opportunity to revise the request by informing [him] of the manner in which [ODRC's] records are maintained." It did not do that. Instead, the chief inspector's office waited until

after Howard filed the complaint in this case to argue that Howard's request was ambiguous. That argument is foreclosed by our precedent.

**{¶ 56}** Lastly, to the extent that the chief inspector's office claims that it believed that Howard's request appeared to be seeking only information and not copies of public records, that belief was not reasonable. As explained in more detail below, the plain language of the request made it abundantly clear that Howard was requesting documents, not information.

**{¶ 57}** To avoid the obvious outcome that Howard in fact made a public-records request, the majority advocates for the chief inspector's office and introduces a new argument on its behalf. I turn to that new argument now.

*2. The Majority's Novel Approach*

**{¶ 58}** "'[O]ur judicial system relies on the principle of party presentation, and courts should ordinarily decide cases based on issues raised by the parties.'" *Snyder v. Old World Classics, L.L.C.*, 2025-Ohio-1875, ¶ 4, quoting *Epcon Communities Franchising, L.L.C. v. Wilcox Dev. Group, L.L.C.*, 2024-Ohio-4989, ¶ 15. "Under the principle of party presentation, 'we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'" *Id.*, quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). As Judge Richard Posner once explained, "we cannot write a party's brief, pronounce ourselves convinced by it, and so rule in the party's favor. That's not how an adversarial system of adjudication works." *Xue Juan Chen v. Holder*, 737 F.3d 1084, 1085 (7th Cir. 2013).

**{¶ 59}** But the party-presentation principle is not "ironclad," *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020), and there are exceptions to it. Most notably, we have recognized that "it is axiomatic that '[s]ubject-matter jurisdiction cannot be waived and is properly raised by this court sua sponte.'" *State ex rel. Dunlap v. Sarko*, 2013-Ohio-67, ¶ 13, quoting *State v. Davis*, 2011-Ohio-5028, ¶ 11. Further, we have the authority and the duty to "say what the law is," *Marbury*

*v. Madison*, 5 U.S. 137, 177 (1803), so that we must independently determine the meaning of a constitutional or statutory provision regardless of whether a party has made a correct argument for what it means, *see State ex rel. Cable News Network, Inc. v. Bellbrook-Sugarcreek Local Schools*, 2020-Ohio-5149, ¶ 48 (Kennedy, J., dissenting).  As Judge Patrick J. Bumatay of the United States Court of Appeals for the Ninth Circuit said, "judges are not like lemmings, following the parties off of the jurisprudential cliff."  Patrick J. Bumatay, Opening Address, The Federalist Society 2025 National Lawyers Convention, https://www.youtube.com/watch ?v=poT1A5Z_Lm8 (accessed Apr. 1, 2026) [https://perma.cc/CE6Z-K7NS].

{¶ 60} But there is no basis to set aside the party-presentation principle here, as this case boils down to the *factual* question of whether Howard made a request for public records.  Yet the majority nonetheless raises a novel argument of its own creation—an argument so novel that the chief inspector's office did not think of it.  The majority claims that Howard made a discovery-like request for documents during a grievance appeal, even though there are "no discovery provisions in the inmate-grievance procedure, and the inspector's office does not produce documents for the aggrieved inmate as part of the grievance-appeal procedure."  Majority opinion at ¶ 22.  Therefore, according to the majority, it was reasonable for the chief inspector's office to ignore Howard's request for documents.

{¶ 61} The problem is that the chief inspector's office never claimed that it misconstrued Howard's public-records request as a request for discovery—instead, the majority dreams up that argument itself.  But "no matter the theories we might conjure up on a party's behalf, the longstanding party presentation rule confines us to considering only the arguments raised, not those we could imagine."  *Nash v. Bryce*, 157 F.4th 436, 467 (6th Cir. 2025) (Readler, J., dissenting).  The majority would be wise to adhere to the party-presentation principle in this case because it "helps protect against the creation of accidental or mistaken law. . . . After all, as each of us should recognize, a 'dose of judicial humility requires acknowledging

that even seemingly straightforward legal issues can have hidden wrinkles,'" *id.* (Readler, J., dissenting), quoting *Su v. Med. Staffing of Am., L.L.C.*, 2023 WL 3735221, *5 (4th Cir. May 31, 2023) (Richardson, J., dissenting).

**{¶ 62}** The majority also teases out from the chief inspector's office's merit brief its own argument that "whether a relator has clearly shown that he made a public-records request *may depend on the context* in which the request was made" (emphasis added), majority opinion at ¶ 18.

**{¶ 63}** Both the majority's discovery-request and contextual arguments are contrary to the Public Records Act and *patently wrong*.

### a. The Majority's Erroneous Conclusion That Howard Made a Discovery Request

**{¶ 64}** At the outset, recognize the majority's concession: while the majority labels Howard's request for documents "a discovery-like request," *id.* at ¶ 24, the majority concedes that "what Howard requested—work-schedule assignments and copies of ODRC policies—might constitute public records," if those records had been requested separately from Howard's grievance appeal, *id.* at ¶ 22.

**{¶ 65}** But after declaring it a discovery-like request, the majority steamrolls to its conclusion that Howard did not make a public-records request and implies that he should have asked someone else for the records. But that declaration is wrong in light of the language of Howard's request, which the majority does not analyze.

**{¶ 66}** Below is the request in controversy:

| 06/18/23 13:36 | DEVIN HOWARD | Inmate Response | I spoke to Horvath on or about 6/15/23 (his latest shift in Superior A/B) between 6:30 pm and 6:45 pm, whereby he stated that he was unable to complete theft loss report as due to alternating schedule assignment. However, the reason for escalating is that inspector of institutional services has not described what steps were taken to investigate the complaint. See OAC 5120-9-31(J)(2); 5120-9-32(C). No reference was made as to interviews of inmate Barrino, Haynes (or Hayes), Horvath, or myself. Additionally, I request the work schedule assignment (the unit where assigned and times and dates) of C.O. Horvath and C.O. Haynes (or Hayes) (blond, female C.O. that has blue eyes |
| | | | and wears glasses) from May 23, 2023 to June 17, 2023. I also request a copy of ODRC Policy 09-INV-01 and 61-PRP-01. |

{¶ 67} The Public Records Act provides that, subject to certain exceptions, "upon request by any person, a public office or person responsible for public records shall make copies of the requested public record available to the requester." R.C. 149.43(B)(1). The majority acknowledges that the Public Records Act does not require a requester to label a public-records request as a "formal public records request" and that the requester is generally not required to "'"cite a particular rule or statute when making a request.'"'" Majority opinion at ¶ 13, quoting *State ex rel. Berry v. Booth*, 2024-Ohio-5774, ¶ 9, quoting *State ex rel. Ware v. Dept. of Rehab. & Corr.*, 2024-Ohio-1015, ¶ 16 (lead opinion).

{¶ 68} The Public Records Act also does not require the use of a set form or "talismanic language" for a requester to make a public-records request. *Berry* at ¶ 122 (Kennedy, C.J., concurring in part and dissenting in part). Instead, the requester must "reasonably identify what public records are being requested" or the records custodian may deny the request. R.C. 149.43(B)(2) and (3). And we know that Howard did reasonably identify the requested records because the chief inspector's office concedes in its merit brief that the request "fairly described" the records sought.

{¶ 69} To be sure, Howard's request for public records is contained in the same paragraph as Howard's grievance appeal. But read the words and phrases that

Howard wrote on the grievance form, paying special attention to the grammar and punctuation that he uses.

{¶ 70} The first sentences Howard wrote on the grievance form relate to Howard's appeal.  Howard says:

> I spoke to Horvath on or about 6/15/23 (his latest shift in Superior A/B) between 6:30 pm and 6:45 pm, whereby he stated that he was unable to complete theft loss report as due to alternating schedule assignment.  *However, the reason for escalating is that inspector of institutional services has not described what steps were taken to investigate the complaint.  See [Adm.Code] 5120-9-31(J)(2); 5120-9-32(C).*

(Emphasis added.)

{¶ 71} Howard begins his grievance appeal by explaining what he says Horvath told him.  But that was not *why* Howard escalated his grievance.  Howard then transitions by saying "[h]owever."

{¶ 72} "However" is a common word that should be given its plain and ordinary meaning.  *See Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 245 (1978) ("[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning."); *see also Rose*, 2025-Ohio-1491, at ¶ 109 (Kennedy, C.J. concurring in part and dissenting in part) (applying a "plain reading" of kites in a public-records case).  "However" can signal a contrast in the sense of "on the other hand" or "but."  *Webster's Third New International Dictionary* (2002).  Howard uses "however" to transition away from what he said in the first sentence.  "However, the reason for escalating" his grievance, Howard says, is because the inspector of institutional services did not comply with the Ohio Administrative Code.  According to Howard, the inspector of institutional services

did not describe "what steps were taken to investigate the complaint" in accordance with Adm.Code 5120-9-31(J)(2) and 5120-9-32(C). In support of his position, Howard states, "No reference was made as to interviews of inmate Barrino, Haynes (or Hayes), Horvath, or myself."

{¶ 73} Howard's analysis of the inspector of institutional services' report was correct because Melton modified the decision and ordered the inspector of institutional services to "complete a review of [Howard's appeal] and author a SUPPLEMENTAL DISPOSITION within the next 14 days." (Capitalization in original).

{¶ 74} The second matter addressed by Howard on the grievance form is his request for public records. He sets the public-records request apart from the appeal by using the word "additionally": "*Additionally*, I request the work schedule assignment (the unit where assigned and time and dates) of C.O. Horvath and C.O. Haynes (or Hayes) . . . ." (Emphasis added.)

{¶ 75} "Additionally" is also a common word that is accorded its plain and ordinary meaning. *See Alexander*, 53 Ohio St.2d at 245-246. By using "additionally," Howard referred to something more than or other than his grievance appeal—i.e., in addition to the chief inspector's office hearing his appeal, he wanted something else, namely, the work-schedule assignments of two correction officers. *See Webster's Third New International Dictionary* (2002) (defining "additionally" as "in or by way of addition"). By using "additionally," Howard signaled a transition from one thought (his grievance appeal) to another (his public-records request).

{¶ 76} Howard also used the word "request." This tells us something. Notably, in the majority opinion "request" is used 28 times in the phrase "public-records request." That phrase has been used countless times in this court's opinions. "Public-records request" is essentially a term of art. So when Howard used the word "request" on the grievance form, any public-service employee who

works with records should be put on alert that a public-records request has been made. Notably, the version of ODRC Policy No. 07-ORD-02 in effect when Howard made his request told all ODRC employees to "'familiarize themselves with the records considered "public" and "non-public" by ODRC,'" because "they might be called upon to '[d]etermin[e] whether a record is a public record.'" (Bracketed text added in *Berry*.) *Berry*, 2024-Ohio-5774, at ¶ 53 (Kennedy, C.J., concurring in part and dissenting in part), quoting former ODRC Policy No. 07-ORD-02(VI)(A)(2) (effective Apr. 1, 2021).

{¶ 77} If there was any uncertainty about whether Howard was asking for public records, that uncertainty was dispelled with Howard's next sentence: "I *also* request a *copy* of ODRC Policy 09-INV-01 and 01-PRP-01." (Emphasis added.)

{¶ 78} The two italicized words are important here. The word "also" creates a connection to the prior sentence. Howard is saying that "similarly" to the request he made for the work-schedule assignments, he *also* would like a *copy* of two of ODRC's policies. *See Webster's Third New International Dictionary* (2002) (defining "also"). This court has recognized that asking for a "copy" of a record is a clear enough request for a public record. *See Berry* at ¶ 9; *accord Ware*, 2024-Ohio-1015, at ¶ 15 (lead opinion).

{¶ 79} This court's interpretation of a public-records request—just like its interpretation of a constitutional, statutory, or contract provision—should be based on the plain meaning of the text. *See State ex rel. Sylvania Home Tel. Co. v. Richards*, 94 Ohio St. 287, 294 (1916) (construing the Ohio Constitution); *Lingle v. State*, 2020-Ohio-6788, ¶ 14-15 (construing a statute); *Alexander*, 53 Ohio St.2d at 245-246 (construing a contract); *see also State ex rel. Berry v. Indus. Comm.*, 2025-Ohio-4720, ¶ 32 ("Interpreting text involving common words used in their ordinary sense is a task" routinely performed by courts.); *Rose*, 2025-Ohio-1491, at ¶ 109 (Kennedy, C.J. concurring in part and dissenting in part) (referring to a

plain reading of a kite). This is essential to our role as neutral arbiters of fact and law.

{¶ 80} But in its quest to achieve a specific outcome on behalf of the chief inspector's office, the majority gives only lip service to the words of the Public Records Act. It recognizes that Howard requested something. And it acknowledges that the documents Howard requested could be public records subject to disclosure. But as I understand its argument, the majority believes that the chief inspector's office lacked "fair notice," majority opinion at ¶ 14, that Howard had submitted a public-records request because the request appeared to be a discovery-like demand for documents as part of his grievance appeal even though "the [chief] inspector's office does not produce documents for the aggrieved inmate as part of the grievance-appeal procedure," *id.* at ¶ 22.

{¶ 81} The majority is essentially saying that because the chief inspector's office does not provide discovery during a grievance appeal, it could reasonably assume that any request for documents made in connection with a grievance appeal is a demand for discovery that it can ignore. That is a non sequitur. If discovery is not available in a grievance-appeal procedure, then how could Melton reasonably think that Howard made a discovery request? That is, if Melton was not expecting a discovery request, why would he assume that Howard had made one? But in any case, no one could reasonably mistake Howard's request for the work-schedule assignments of two correction officers and for two ODRC policies as a demand for discovery. As explained above, Howard plainly made a public-records request.

{¶ 82} Under the surface of the majority's reasoning is a belief that Howard submitted his public-records request to the wrong person: Melton avers that he does not produce documents during grievance appeals; so therefore, it seems to the majority, any public-records request had to be made through different channels. That conclusion, however, is not supported by the plain language of the Public Records Act.

**{¶ 83}** As this court explained long ago, "[t]he question is not what did the general assembly intend to enact, but what is the meaning of that which it did enact." *Slingluff v. Weaver*, 66 Ohio St. 621 (1902), paragraph two of the syllabus. Undefined words in a statute "are to be given the meaning that proper grammar and usage would assign them," Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, 140 (2012).

**{¶ 84}** The Public Records Act identifies two entities from which a public-records requestor may obtain a public record: "a public office or person responsible for public records," R.C. 149.43(B)(1). To my knowledge, this court has never said that this language is ambiguous or of questionable meaning.

**{¶ 85}** The "'use of the word "or," a disjunctive term, signifies the presence of alternatives.'" *Berry*, 2024-Ohio-5774, at ¶ 49 (Kennedy, C.J., concurring in part and dissenting in part), quoting *In re Estate of Centorbi*, 2011-Ohio-2267, ¶ 18. "It expresses the existence of a choice between two mutually exclusive possibilities; only one of the two requirements needs to be satisfied." *State ex rel. Teagarden v. Igwe*, 2024-Ohio-5772, ¶ 67 (Kennedy, C.J., concurring in part and dissenting in part); *see also Reading Law* at 116 ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives." [Italics in original.]). "The statute therefore speaks in terms of two entities that must respond to a public-records request: the public office itself or a person responsible for public records." *Berry* at ¶ 49 (Kennedy, C.J., concurring in part and dissenting in part). It follows that a requester may ask for a public record from either the public office or a person responsible for the public records being sought.

**{¶ 86}** As used in the Public Records Act, "public office" means as "any state agency . . . or entity established by the laws of this state for the exercise of any function of government." R.C. 149.011(A). Under this definition, the chief inspector's office is a public office subject to the Public Records Act because it was established by law. *See* R.C. 5120.06(B); Adm.Code 5120-9-30. Here, Howard

made a public-records request in an electronic submission directed to a public office—the chief inspector's office. Tellingly, the chief inspector's office never argues that it does not maintain the records that Howard requested or that it does not have access to them. It therefore had an obligation to fulfill Howard's request.

{¶ 87} So even if Melton did not have the ability to fulfill Howard's public-records request himself because he does not produce documents as part of the grievance-appeal procedure, that did not relieve the chief inspector's office of its duty to respond to the public-records request. R.C. 149.43(B)(1) imposes on "a public office or person responsible for public records" a duty to make copies of requested public records available to the requestor.

{¶ 88} As I have previously explained,

> when an employee of a public office or any person responsible for the public office's public records receives a public-records request, a joint duty arises for either the public office or a person responsible for public records to respond to it. And since one or the other must respond, the failure of one does not excuse the failure of the other.

*Berry*, 2024-Ohio-5774, at ¶ 51 (Kennedy, C.J., concurring in part and dissenting in part). That means that even if Melton could not fulfill the request himself, the chief inspector's office still was obliged to ensure that the request got fulfilled. The chief inspector's office could not ignore the public-records request simply because it was sent to the wrong person within the office. *See id.* at ¶ 54 (Kennedy, C.J., concurring in part and dissenting in part).

{¶ 89} Building on its discovery-request argument, the majority then asserts on behalf of the chief inspector's office that the context in which the request was made matters. Context does matter when construing the meaning of words, but not in the way the majority contends.

### b. Building on the Chief Inspector's Office's Argument, the Majority Declares That Context Matters

{¶ 90} The majority asserts that the "context in which the request is made" matters. Majority opinion at ¶ 15. However, the majority and I rely on different concepts of context. I am writing about the context of the language of the request within the document to be construed. The majority looks outside the document to the factual context of its creation.

{¶ 91} In distilling the meaning of a legal instrument, we are constrained to look for it first within the four corners of the instrument. That is not literalism but is instead in line with "our often-expressed commitment to apply the plain and ordinary meaning of [a] text," *Stingray Pressure Pumping, L.L.C. v. Harris*, 2023-Ohio-2598, ¶ 20. When language conveys a clear and definite meaning, there is no need to go beyond the words on the page. *See id*; *In re Adoption of A.C.B.*, 2020-Ohio-629, ¶ 8 (lead opinion) ("The starting point—and because the language is clear, the ending point—for our analysis is the text of the statute."); *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself. . . . Where, as here, that examination yields a clear answer, judges must stop.").

{¶ 92} Now, of course, in deciding the meaning of words and sentences, we need to know the context in which they are used—we look to "discern literal meaning in context," Scalia & Garner, *Reading Law* at 40; *see also* R.C. 1.42 ("Words and phrases shall be read in context . . . .").

{¶ 93} So, for example, even using the dictionary requires an understanding of the context of words. Take the word "copy" as used in Howard's public-records request. "Copy" can mean a reproduction of a document, but it can also mean something to be imitated, like a model. *See Webster's Third New International Dictionary* (2002). Reading the word "copy" in the context of the sentence

requesting a copy of two policies reveals that Howard is seeking a reproduction, not the template for the policies.

{¶ 94} Context also matters in the sense that a document may be made up of interrelated parts that need to be read in conjunction with one another. *See Reading Law* at 167. So "[i]n ascertaining the plain meaning of the statute," for example, "the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).

{¶ 95} Examining the context of words used in a text and interpreting them is inherent in reading and understanding language. *See* Scalia & Garner, *Reading Law* at 53; *id.* at 56 ("words are given meaning by their context"). But that is not what the majority is doing in this case.

{¶ 96} Remember that in the case of statutory interpretation under the plain-meaning rule, "if the text of a statute is unambiguous, it should be applied by its terms without recourse to policy arguments, legislative history, or *any other matter extraneous to the text*." (Emphasis added.) *Id.* at 436. "In other words, when the statutory language is unambiguous, courts should not rely on *extrinsic information* to discern the meaning of the statute." (Emphasis added.) *Gabbard v. Madison Local School Dist. Bd. of Edn.*, 2021-Ohio-2067, ¶ 119 (DeWine, J., dissenting). "'[E]xtrinsic aids to construction' may be used 'to solve, but not to create an ambiguity.'" *Chamber of Commerce of the United States v. Whiting*, 563 U.S. 582, 599 (2011), quoting *United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 83 (1932).

{¶ 97} Similar rules apply to construing the language of other legal instruments, such as a contract. We have held that "[w]hen contractual language is clear, we look no further than the writing itself to determine the parties' intent." *Neuro-Communication Servs., Inc. v. Cincinnati Ins. Co.*, 2022-Ohio-4379, ¶ 13. That is, "where there is no ambiguity, a foray into extrinsic evidence is

inappropriate." *Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945, ¶ 37 (DeWine, J., dissenting). In those circumstances, a court cannot resort to the external, factual context of contract formation when the instrument's terms are unambiguous. *See Lutz v. Chesapeake Appalachia, L.L.C.*, 2016-Ohio-7549, ¶ 9-10.

{¶ 98} In this case, we are asked to decide whether Howard made a public-records request. That involves textual analysis similar to interpreting a statute, contract, or other text. In all these cases, we are simply reading words on a page and determining their meaning. As explained above, based on the language Howard used, he plainly requested copies of public records. I get there by using intrinsic linguistic tools of interpretation, *see Gabbard* at ¶ 120 (DeWine, J., dissenting), to locate the plain meaning of the words Howard used. The majority tellingly neither interprets the language of Howard's request nor asserts that the language he used is ambiguous.

{¶ 99} This is where the majority goes astray: it looks to external information regarding the process of Howard's making his request to find ambiguity in the text of the request. That is no different than impermissibly looking to "the circumstances surrounding the parties at the time the contract was made," *Lutz* at ¶ 9, in reading an unambiguous contract or considering "outside sources like legislative history," Scalia & Garner, *Reading Law* at 370, in construing an unambiguous statute. The majority unnecessarily goes beyond the text of the request and looks at extrinsic information—the factual circumstances of Howard's making the request—to explain why it believes Howard's request was confusing.

{¶ 100} The majority therefore takes an unambiguous text and considers external circumstances to find that the text is ambiguous. That is backwards. We do not start from an unambiguous text and work our way back to finding ambiguity based on extrinsic information. When text is plain and unambiguous on its face, we go no further. We do not go beyond the four corners of the document containing

the text to determine whether it means something different than its words convey. When courts do go beyond the plain language of the text, it is a sure sign of an outcome-driven determination.

{¶ 101} Any reader should have known that Howard had requested public records just by looking at the words he wrote. The request was received by a public office, and that office was obligated to provide Howard with copies of the requested public records within a reasonable time. *See* R.C. 149.43(B)(1). The fact that Melton unreasonably thought that Howard had requested only information did not absolve the chief inspector's office of its duty to fulfill the request. The majority errs in using information extrinsic to the text to hold that Howard did not prove that he made a public-records request.

{¶ 102} In its analysis, the majority also adds something new to the statute—that the "context in which [a records] request is made" must show that a records custodian had "fair notice" that it received a public-records request, majority opinion at ¶ 14-15. But that new standard is found nowhere in the unambiguous language of the Public Records Act or this court's interpretation of it. And why is fair notice the standard? Why not require something more, like actual notice? Or why not require something less, like constructive notice? The majority does not tell us; it just plucks this new fair-notice standard from the air, without any briefing on the subject or explaining from where it is derived. This court has held that it is reversible error for a court of appeals to decide cases based on an unbriefed issue without giving the parties an opportunity to brief that issue. *State v. Tate*, 2014-Ohio-3667, ¶ 21. We should hold ourselves to that same standard.

{¶ 103} The majority seems to expand on the chief inspector's office's argument in its merit brief that "[w]hile the Court has held that requesters are not required to specifically identify their requests as a public-records request, their request becomes ambiguous when it is couched or embedded within another

administrative procedure without further distinction." Again, that argument suggests that this court should be looking to the factual context in which the request is made—therefore going beyond the four corners of the request itself without first determining that the request is ambiguous. And the majority builds on that argument, holding that the factual context in which a request is made can trump the plain language of the request itself. It is odd that jurists who pride themselves on their textualist judicial philosophy in all other cases of judicial construction would abandon that textualism when it comes to reading public-records requests.

{¶ 104} How the majority applies "context matters" is contrary to the plain text of the Public Records Act, which requires a requester only to "reasonably identify what public records are being requested," R.C. 143.49(B)(2). Ohio's public-records law does not require a requester, when making an otherwise unambiguous public-records request, to foresee a records custodian's perceptions about the factual context of the request.

{¶ 105} The Public Records Act has existed since 1963. *See* Am.Sub.H.B. No. 187, 130 Ohio Laws, Part I, 155, 1644. My review of this court's precedent proves to me that when determining whether a requester "reasonably" identified the records being sought, this court has looked to the four corners of the request. That is a problem for the majority here because ODRC admits in its merit brief that "[t]here is no doubt [that Howard] fairly described the records he sought." To overcome that concession, the majority makes a seismic shift in Ohio's public-records caselaw by changing the way this court evaluates public-records requests under the cover of "context matters."

{¶ 106} Mark my words: the majority's decision today to declare that the factual context surrounding a request trumps the plain language of a public-records request when determining whether a requester "reasonably" identified the records sought will bring a never-ending avalanche of complaints for writs of mandamus

when records custodians deny public-records requests because the "context" in which the request was made was ambiguous.

{¶ 107} But if what the majority really wants is to declare that a valid public-records request must be in a single-source communication—in other words, that it cannot be included with any other communication that is transmitted to a public office—then the majority should say that, even though there is no authority for that in the Public Records Act.

{¶ 108} For the reasons stated above, I would not look beyond the four corners of Howard's unambiguous public-records request. Because the chief inspector's office has not provided all the records requested, I would grant Howard the requested writ of mandamus.

### D. Howard is Entitled to Statutory Damages

{¶ 109} In the chief inspector's office's fourth proposition of law, it argues that this court should reduce or deny statutory damages because (1) based on caselaw at the time Melton responded to Howard's request, Melton reasonably believed that his actions "did not constitute a failure to comply" with R.C. 149.43(B), and (2) Melton reasonably believed that his conduct served the public policy underlying the Public Records Act by interpreting Howard's request as a request for information under the inmate-grievance procedure.

{¶ 110} Under the Public Records Act, a records custodian, upon a request by "any" person for a public record, is required to make copies available to the requester within a reasonable time. R.C. 149.43(B)(1). However, if the request is overly broad or ambiguous, the records custodian is required to inform the requester how the records are maintained and accessed by the public office and provide the requester with an opportunity to revise the request. R.C. 149.43(B)(2). If the records custodian denies the request, the custodian must explain to the requester why the request was denied, R.C. 149.43(B)(3), and the explanation must be in writing if the initial request was made in writing—as was the case here. The chief

inspector's office did none of these things. Therefore, the chief inspector's office violated R.C. 149.43(B), and Howard is entitled to statutory damages in the amount of $1,000. *See* R.C. 149.43(C)(2).

{¶ 111} The chief inspector's office makes three arguments in support of its position that statutory damages should be reduced or denied in this case. First, it argues that Howard requested only information. However, as explained above, it was unreasonable for the chief inspector's office to treat Howard's public-records request as a request for information. Second, the chief inspector's office argues that Howard never told it that he was "dissatisfied with [Melton's] response." Yet nothing in R.C. 149.43 requires Howard to do that. And third, the chief inspector's office argues that ODRC's policies are "readily available at the libraries of all correctional institutions" that house incarcerated persons. But the fact that one of the records Howard requested is available in ODRC's libraries does not absolve the chief inspector's office of the duty to respond to the public-records request that Howard directed to it specifically.

{¶ 112} In short, none of the chief inspector's office's arguments provide a basis to reduce the award of statutory damages under R.C. 149.43(C)(2). Consequently, Howard is entitled to the full amount of $1,000. *See id.*

## II. CONCLUSION

{¶ 113} "'"[P]ublic records are the people's records, and . . . the officials in whose custody they happen to be are merely trustees for the people."'" *State ex rel. Natl. Broadcasting Co., Inc. v. Cleveland*, 38 Ohio St.3d 79, 81 (1988), quoting *Dayton Newspapers v. Dayton*, 45 Ohio St.2d 107, 109 (1976), quoting *State ex rel. Patterson v. Ayers*, 171 Ohio St. 369, 371 (1960). "Public records are one portal through which the people observe their government, ensuring its accountability, integrity, and equity while minimizing sovereign mischief and malfeasance." *Kish v. Akron*, 2006-Ohio-1244, ¶ 16.

{¶ 114} Before the case at hand, under Ohio law, the "context" in which a request was made—i.e., what happened beyond the four corners of the request—did not matter. The plain language of the request determined whether a request was a public-records request. Today, however, the majority does not apply the Public Records Act—it rewrites it. And the seismic shift the majority makes in interpreting the Public Records Act will not settle the law; it will cause upheaval—upheaval that was avoidable had the majority simply applied the plain language of the statute and this court's precedent.

{¶ 115} After Howard filed this case seeking a writ of mandamus, an employee at Lake Erie Correctional Institution provided Howard with copies of the two ODRC policies that he requested. That left outstanding Howard's public-records request for the 2023 work-schedule assignments of two correction officers.

{¶ 116} Applying the plain text of the statute and this court's precedent, I would grant a writ of mandamus ordering the chief inspector's office to provide Howard with copies of those work-schedule assignments or to certify to this court that those records no longer exist. I would also award Howard statutory damages in the amount of $1,000.

{¶ 117} Because the majority does otherwise, I concur in part and dissent in part.

_____

Devin D. Howard, pro se.

Dave Yost, Attorney General, and D. Chadd McKitrick and Adam Beckler, Assistant Attorneys General, for respondent.

_____